# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY
378 N. Main Ave.
Tucson, Arizona 85701,

SAVE RGV
613 West St. Charles St.
Brownsville, Texas 78520,

THE CARRIZO/COMECRUDO NATION
OF TEXAS, INC.
1200 W Elizabeth St.
Brownsville, Texas 78520,

SOUTH TEXAS ENVIRONMENTAL
JUSTICE NETWORK
1249 E Adams St.
Brownsville, Texas 78520,

   *Plaintiffs,*

    v.

BRIAN NESVIK,
in his official capacity as Director of the
United States Fish and Wildlife Service,
1849 C Steet, NW
Washington, DC 20240,

UNITED STATES FISH AND WILDLIFE
SERVICE,
1849 C Street, NW
Washington, DC 20240,

   *Defendants.*

Case No.  1:26-cv-02053

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

1

**INTRODUCTION**

1.      Plaintiffs Center for Biological Diversity, Save RGV, the Carrizo/Comecrudo Nation of Texas, Inc., and South Texas Environmental Justice Network challenge the decision by Defendants Brian Nesvik, Director of the United States Fish and Wildlife Service, and the United States Fish and Wildlife Service ("the Service") to approve the "Boca Chica Land Exchange" ("Exchange") with Space Exploration Technologies Corp. ("SpaceX").  The Exchange gives SpaceX 715 acres of wildlife corridor lands in the Lower Rio Grande Valley National Wildlife Refuge in exchange for 683 acres of private land—most of which will be added to a separate refuge—to allow SpaceX to substantially expand its operations in Cameron County, Texas. Plaintiffs seek a declaratory judgement that the Service violated the National Wildlife Refuge System Improvement Act, the National Historic Preservation Act, the National Environmental Policy Act, and the Administrative Procedure Act in approving the Exchange; and injunctive relief to prohibit the execution of the Exchange unless and until the Service fully complies with the law.

2.      SpaceX's rocket launch facility, rocket test facility, and expansive industrial complex are at direct odds with the goals and management priorities of the directly adjacent Lower Rio Grande Valley National Wildlife Refuge.  In addition to the bright lights, loud noise, and vehicle traffic caused by SpaceX's operations, the rockets occasionally explode during testing and launches, sending debris and shrapnel into surrounding lands, including the Refuge and its wildlife habitat.  Rather than exercising its enforcement authority to protect the Refuge from SpaceX's activities and to require mitigation to address the harm SpaceX has caused, the Service seeks to give SpaceX over 700 acres within the Refuge, which will allow SpaceX to further its encroachment into the Refuge and further degrade and fragment the Refuge's habitat.

While the Service will acquire acreage adjacent to the separate Laguna Atascosa National Wildlife Refuge, the Exchange directly conflicts with the mission and purposes of Lower Rio Grande Valley National Wildlife Refuge, in violation of the National Wildlife Refuge Improvement Act.

3.     The following map from the Service's Environmental Assessment shows the parcels that would be divested and acquired, in relation to SpaceX's location at Starbase, Texas:



Despite the Service's longstanding vision that the Lower Rio Grand Valley National Wildlife Refuge will eventually include 132,500 acres of contiguous, protected habitat along the Rio Grande, the Service has decided to divide the Refuge's largest contiguous parcel by giving over 700 acres of the Refuge to SpaceX for its expanding industrial operations.

4

4.      The Service simply cannot demonstrate that the Exchange would provide a conservation benefit to the Lower Rio Grande Valley National Wildlife Refuge.  The Exchange is therefore inconsistent with the National Wildlife Refuge Improvement Act.

5.      The Service also violated the National Historic Preservation Act in approving the Exchange, as it failed to ensure the preservation of the Palmito Ranch Battlefield National Historic Landmark within the Lower Rio Grande Valley National Wildlife Refuge, and failed to require that this historic property be exchanged for a "comparable historic property."  The Exchange would enable SpaceX to commercially develop this land for residential, commercial, institutional, infrastructure, and manufacturing activities.  The Service's own archaeological consultant team recommended a "finding of adverse effect" under the Act and the Service has failed to require adequate measures to mitigate that effect.

6.      The Service collaborated with SpaceX to come up with unfounded "Biological Importance Scores" in an attempt to contrast the lands that would be given to SpaceX and the lands that would be acquired.  These Biological Scores, however, are directly contradicted by the record, and fail to take into account that any degradation of the Refuge lands to be given to SpaceX was in fact caused by SpaceX, and that further degradation of public lands will occur if the Exchange moves forward.

7.      The Service's environmental analysis of the Exchange also fails to meet the requirements of the National Environmental Policy Act.  The Service failed to consider reasonable alternatives and did not take the requisite "hard look" at the impacts of the Exchange from SpaceX's expansion of its activities.  Nor did the Service adequately consider and address the harm that would result to the local community from the Exchange, including to the sacred lands of the Carrizo/Comecrudo people.

5

8.      The Service is also unlawfully relying on a wholly outdated management plan for the Lower Rio Grande Valley National Wildlife Refuge.  The National Wildlife Refuge Improvement Act requires the Service to update and revise comprehensive conservation plans at least every 15 years, or sooner when the conditions that affect the Refuge have changed significantly.  The Service completed the management plan for this Refuge in 1997, nearly 30 years ago, and long before SpaceX was created.  SpaceX's decision to locate its rocket launch facility, industrial complex, and company town of Starbase at the doorstep of the Refuge—as well as building a rocket "test site" on Refuge-adjacent inholdings—has significantly changed the conditions affecting this Refuge, and the Service's ongoing failure to update and revise its management plan further violates the National Wildlife Refuge Improvement Act.

9.      Plaintiffs request the Court to find that the Service's decision approving and authorizing the Boca Chica Land Exchange is arbitrary, capricious, an abuse of discretion, and contrary to law; and to vacate the Service's decision authorizing the Exchange.

**JURISDICTION**

10.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331; *id.* § 1346; and 5 U.S.C. §§ 551 *et seq*. because this action involves the United States as a defendant and arises under the laws of the United States, including the National Wildlife Refuge System Improvement Act, 16 U.S.C. § 668dd; the National Historic Preservation Act, 54 U.S.C. § 300101 *et seq.*; the National Environmental Policy Act, 42 U.S.C. §§ 4331 *et seq*.; and the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*  An actual justiciable controversy exists between Plaintiffs and Defendants.  The challenged agency actions are final and subject to this Court's review under the Administrative Procedure Act, 5 U.S.C. §§ 702, 704, and 706.  The relief requested is proper pursuant to 28 U.S.C. §§ 2201 and 2202, and 5 U.S.C. §§ 705 and 706.

**VENUE**

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants reside in the district and the Service has its headquarters in the district.  Additionally, at least some of the events and omissions giving rise to the claims in this case occurred in the district. Plaintiff Center for Biological Diversity also has an office in the district.

**PARTIES**

12.    Plaintiff Center for Biological Diversity ("the Center") is a national nonprofit organization that works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction.  The Center is headquartered in Tucson, Arizona, and has over 94,000 members.  The Center brings this action on behalf of its adversely affected members.  The Center has worked for years to protect wildlife species that have been harmed by SpaceX's operations in Texas, including migratory birds and other protected species that rely on the Lower Rio Grande Valley National Wildlife Refuge.

13.    Plaintiff Save RGV is a nonprofit organization that advocates for environmental justice and sustainability through addressing the causes and consequences of habitat loss and climate change that affect the health and well-being of the entire Rio Grande Valley community. Through its advocacy, research, and publications, Save RGV promotes, monitors, and preserves wildlife and its habitat and protects air and water quality and the natural resources of the Rio Grande Valley.  Save RGV also serves to protect and defend the public's right to access public lands, which includes the Lower Rio Grande Valley National Wildlife Refuge.

14.    Plaintiff the Carrizo/Comecrudo Nation of Texas, Inc. is a Texas nonprofit membership organization dedicated to serving the cultural, social, educational, spiritual, linguistic, economic, health, and traditional needs of its members and descendants of the

7

Carrizo/Comecrudo Nation of Texas and other indigenous or Native American groups. The Tribe members live by their mission of preserving, maintaining, protecting, and offering services that will better their tribal communities to overcome the erasure of the Original People of Texas. The Tribe promotes wellness and health by providing services in times of crisis. The Tribe seeks to protect ancestral lands and relatives and to honor their ancestors. Boca Chica and the surrounding area are vital and sacred to the Carrizo/Comecrudo People and their ancestral traditions. The Tribe regularly holds ceremonial life ways at Boca Chica Beach, including during the equinox and solstice. These ceremonies typically involve between 20 and 30 of the Tribe's members, during which the members leave offerings for ancestors at the beach.

15.    Plaintiff South Texas Environmental Justice Network is a network of directly impacted people of color working towards environmental justice in South Texas. Members of STEJN are organizations and individuals in Cameroun County who reside, recreate, work, worship, or care for sacred lands in the Rio Grande Valley and Boca Chica area.

16.    Plaintiffs have numerous members who live near and/or regularly visit the Rio Grande Valley and Boca Chica area, including the Lower Rio Grande Valley National Wildlife Refuge. Plaintiffs have members who regularly use the public lands in this region, including the Lower Rio Grande Valley National Wildlife Refuge, for hiking, birding, wildlife viewing, photography, and other activities. Plaintiffs' members derive recreational, spiritual, professional, scientific, educational, and aesthetic benefit from their regular use and enjoyment of the Lower Rio Grande Valley National Wildlife Refuge and other public lands and beaches in this region. Plaintiffs' members have specific intentions to continue to use and enjoy these public lands frequently and on an ongoing basis in the future, including this summer.

17.    Plaintiffs have members whose interests are adversely affected by SpaceX's

8

activities and operations in the Boca Chica area.  For example, Mary Angela Branch, who grew up in Brownsville and is a member of the Center and Save RGV, regularly visits the Boca Chica area to enjoy the public lands and beaches, and view wildlife.  She plans to continue visiting this area; however, her ability to enjoy the Boca Chica area has been and will continue to be adversely affected by SpaceX's activities, including through the privatization of lands given over through the Exchange, closures to accommodate SpaceX construction and launch activities, and from the noise, heat, light, explosions, debris, and fires associated with such activities.

18.    Plaintiffs also have members who have researched, studied, observed, and sought protections for habitats and species that are adversely affected by the SpaceX operations and activities.  For example, Jim Chapman, a member of Save RGV who lives in Weslaco, Texas, works to protect the Santa Ana and Lower Rio Grande Valley National Wildlife Refuges, and advocates for the wildlife that use the tracks of brush and forest habitat to migrate between populations.  Mr. Chapman is heavily invested in the preservation of the Boca Chica area, including the Lower Rio Grande Valley National Wildlife Refuge, as it is essential for many of the native wildlife species that he seeks out and enjoys.  Mr. Chapman regularly visits the Boca Chica area, including the Lower Rio Grande Valley National Wildlife Refuge, to view wildlife, particularly birds such as the protected plovers and other migratory species that rely on the area. Mr. Chapman is passionate about the native wildlife and enjoys exposing people to the unique ecosystems of the region.  His interests in observing and protecting the Boca Chica area, including the Lower Rio Grande Valley National Wildlife Refuge, has been and will continue to be adversely affected by SpaceX's activities, including harm from privatization of Refuge lands through the Exchange, closures, increased vehicle traffic and resulting collisions with wildlife, the intense noise, heat, and light from rocket launch and testing activities, and "anomalies" (i.e.,

9

explosions) with these activities.

19.     Closures of public lands and beaches due to SpaceX's operations and activities have adversely affected the Carrizo/Comecrudo Nation's ability to hold their traditional ceremonial life ways and leave offerings for their ancestors.  For example, Juan Mancias, a member of the Tribe, has been prevented from accessing Boca Chica beach, a space sacred to him, because of the frequent beach closures. The Exchange would exacerbate these impacts by privatizing lands that Mr. Mancias visits for religious purposes and increasing closures of remaining Refuge lands.

20.     The Service's Boca Chica Land Exchange with SpaceX threatens Plaintiffs' members' regular use and enjoyment of the Boca Chica area, including the Lower Rio Grande Valley National Wildlife Refuge.  Most directly, the land exchange will privatize over 700 acres of the Lower Rio Grande Valley National Wildlife Refuge, thereby immediately and permanently affecting Plaintiffs' members' ability to use and enjoy this Refuge for recreational, spiritual, and other purposes.  Indirectly, giving these 700-plus acres of the Refuge to SpaceX will further impair Plaintiffs' members' use and enjoyment of this entire area, as the Exchange will allow SpaceX to continue its rapid expansion and negative impacts to the region and its wildlife.

21.     The Service's Boca Chica Land Exchange threatens actual, concrete injuries to Plaintiffs and their members.  These injuries are exacerbated by the Service's failure to comply with the National Wildlife Refuge Improvement Act, the National Historic Preservation Act, the National Environmental Policy Act, and other federal laws in developing and approving the Exchange.  Unless this Court grants the requested relief, the Exchange will be implemented, and the harm to the environment and Plaintiffs' members' who use and enjoy this area will continue

to increase, with their recreational, spiritual, and other interests adversely affected.

22.     The relief that Plaintiffs seek will redress the injuries of Plaintiffs and their members by compelling the Service to comply with National Wildlife Refuge Improvement Act, National Historic Preservation Act, National Environmental Policy Act, and other federal laws. A legally-compliant land exchange that fulfills the conservation mission and purposes of both the National Wildlife Refuge System as a whole and the individual Lower Rio Grande Valley National Wildlife Refuge, as well as a legally-sufficient environmental analysis under the National Environmental Policy Act prior to a decision on whether to proceed with the Exchange, and demonstrated compliance with the National Historic Preservation Act, would redress Plaintiff's members' injuries.

23.     Defendant Brian Nesvik is the Director of the United States Fish and Wildlife Service.  Director Nesvik is responsible for the lawful management of the National Wildlife Refuge System.  Director Nesvik is responsible for approving land exchanges involving more than 40 acres, and is responsible for approving land exchanges valued at $500,000 or more. Director Nesvik is sued in his official capacity.

24.     Defendant United States Fish and Wildlife Service is a federal agency within the United States Department of the Interior.  The Service oversees the National Wildlife Refuge System, and is responsible for the lawful management of the Lower Rio Grande Valley and Laguna Atascosa National Wildlife Refuges.

## LEGAL BACKGROUND

**I.     The National Wildlife Refuge System Improvement Act**

25.     The National Wildlife Refuge Administration Act of 1966 formally established the National Wildlife Refuge System.  16 U.S.C. §§ 668dd.  The National Wildlife Refuge

System is the only category of federal lands that is administered primarily for the conservation of wildlife.  The National Wildlife Refuge System is administered by the United States Fish and Wildlife Service.  16 U.S.C. § 668dd(a)(1).

26.     In 1997, Congress enacted the National Wildlife Refuge System Improvement Act of 1997, which significantly amended the National Wildlife Refuge Administration Act. Public Law 105-57 (Oct. 9, 1997).

27.     The mission of the National Wildlife Refuge System is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations.  16 U.S.C. § 668dd(a)(2).

28.     Each National Wildlife Refuge must be managed to fulfill the mission of the National Wildlife Refuge System as a whole, as well as for the specific purposes for which that individual Refuge was established.  16 U.S.C. § 668dd(a)(3)(A).

29.     In administering the National Wildlife Refuge System, the Service must "ensure that the biological integrity, diversity, and environmental health of the System are maintained for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(4)(B).

30.     The National Wildlife Refuge System Improvement Act of 1997 required the Service to prepare a "comprehensive conservation plan" for each National Wildlife Refuge within 15 years after October 9, 1997.  16 U.S.C. § 668dd(e)(1)(B).

31.     In developing a comprehensive conservation plan, the Service must describe the purpose of the Refuge; the distribution, migration patterns, and abundance of fish, wildlife, and plant populations and related habitats within the planning unit; and significant problems that may adversely affect the populations and habitats of fish, wildlife and plants within the planning unit

and the actions necessary to correct or mitigate such problems.  16 U.S.C. § 668dd(e)(2).

32.    In preparing each comprehensive conservation plan, the Service must, to the maximum extent practicable, consult with adjoining landowners and affected state conservation agencies.  16 U.S.C. § 668dd(e)(3).

33.    Not less frequently than 15 years after the issuance of a comprehensive conservation plan, the Service must revise the plan as may be necessary.  16 U.S.C. § 668dd(e)(1)(A)(iv).  As explained by the Service in its Manual:

> We review a CCP, along with the rest of a refuge's planning portfolio, comprehensively every 15 years, or more frequently if necessary, to determine if a revision or other change is needed. This comprehensive review guides a refuge in determining what changes need to be made to existing plans and what new plans need to be developed to address a refuge's management and planning needs. The review includes assessing the status of existing refuge plans, new information learned through changing conditions, best available science, and the results of inventory and monitoring (see 701 FW 2). Each CCP review outcome is documented in the planning portfolio.

Fish and Wildlife Service Manual, Part 602, § 3.15 (cited as 602 FW 3.15).

34.    The Service must also revise a comprehensive conservation plan if the Service determines that conditions that affect the Refuge have changed significantly.  16 U.S.C. § 668dd(e)(1)(E).  For example, the Service may need to revise a comprehensive conservation plan if ecological conditions or threats change considerably on the Refuge or in the landscape. 602 FW 3.16(A)(1)(c).

35.    Upon completion of a comprehensive conservation plan, the Service must manage the Refuge in a manner consistent with the plan. 16 U.S.C. § 668dd(e)(1)(E).

36.    The Service must develop and implement a process to ensure an opportunity for public involvement in the preparation and revision of comprehensive conservation plans.  *Id.* § 668dd(e)(4)(A).  At a minimum, the Service must require that publication of any final plan shall include a summary of the comments made by states, owners of adjacent lands, local

13

governments, and other affected persons, and a statement of the disposition of concerns expressed in those comments. *Id.*

37.     Prior to the adoption of a comprehensive conservation plan, the Service must issue public notice of the draft proposed plan and provide an opportunity for public comment. *Id.* § 668dd(e)(4)(B).

38.     In administering the National Wildlife Refuge System, the National Wildlife Refuge System Improvement Act requires the Service to ensure that both the mission of the whole System and the purposes of each individual National Wildlife Refuge are carried out. *Id.* § 668dd(a)(4)(D). Importantly, if there is a conflict between the purposes of an individual refuge and the mission of the National Wildlife Refuge System, "the conflict shall be resolved in a manner that first protects the purposes of the refuge, and, to the extent practicable, that also achieves the mission of the System." *Id*.

39.     The National Wildlife Refuge System Improvement Act authorizes the Service to acquire lands by exchange for lands under its jurisdiction which it finds to be suitable for disposition. *Id.* § 668dd(b)(3).  The values of the properties to be exchanged shall be approximately equal, or if they are not approximately equal the values shall be equalized by the payment of cash to the grantor or to the Secretary as the circumstances require. *Id*.

40.     On May 31, 2023, the Solicitor's office of the United States Department of the Interior issued a Memorandum setting forth the criteria for National Wildlife Refuge land exchanges. "This memorandum clarifies the legal standards applicable to refuge land exchanges undertaken by the Department outside of Alaska." U.S. Dept. of Interior Office of the Solicitor, National Wildlife Refuge Land Exchanges at 1 (May 31, 2023) (hereinafter "Solicitor Memo").

41.     The Solicitor concluded that "a refuge land exchange must provide a conservation

benefit to the refuge, and further the individual refuge's purposes." *Id.* at 6.  The Service should only consummate a land exchange if it would further both the National Wildlife Refuge System's mission and the individual Refuge's purposes, *id*. at 10, since "[r]ead in context, the land exchange authority is a means to implement the broader statutory scheme to protect habitat and species and expand the System," *id.* at 6.

42.     The Service must apply "heightened standards" to land exchanges.  *Id.* at 11.

43.     On December 20, 2023, the Service incorporated the requirements of the Solicitor Memo into its procedures for "Non-Purchase Acquisition" at 342 FW 5. For land exchanges outside of Alaska, the Service's procedures require that the exchange must further the purposes for which the National Wildlife Refuge was established.  342 FW 5.7(B)(2)(a).  The exchange must also fulfill the conservation mission of the National Wildlife Refuge System as a whole. 342 FW 5.7(B)(2)(b).

44.     Each land exchange must provide a net conservation benefit to the individual refuge.  342 FW 5.7(B)(2)(c).  As a part of this analysis, the Service must weigh the conservation value of the land to be acquired against the conservation value of the land to be divested, with consideration of any available information about planned uses of the land to be divested and the impacts of those uses on the refuge.  *Id*.

45.     The Service's procedures also require approval by the Director for any exchange involving more than 16.19 hectares (40 acres). 342 FW 5.7(C).

46.     The National Wildlife Refuge System Improvement Act sets forth penalties—including both fines and imprisonment—for violations of the Act and violations of regulations issued thereunder. 16 U.S.C. § 668dd(f), (g).

47.     Under the National Wildlife Refuge System Improvement Act, "[n]o person shall

15

disturb, injure, cut, burn, remove, destroy, or possess any real property or personal property of the United States, including natural growth, in any area of the System; or take or possess any fish, bird, mammal, or other wild vertebrate or invertebrate animals or part or nest or egg thereof." 16 U.S.C. § 668dd(c).

48.     In addition, pursuant to the Service's regulations implementing the National Wildlife Refuge System Improvement Act, no person may "take any animal or plant on any national wildlife refuge," 50 C.F.R. § 27.21; use motor vehicles or other vehicles on national wildlife refuges except on designated routes of travel, *id.* § 27.31; use aircraft "at altitudes resulting in harassment of wildlife, *id.* § 27.34; disturb, injury, spear, poison, destroy, collect, or attempt to do any of the aforementioned activities, *id.* § 27.51; destroy, injure, deface, disturb, or remove property on or from any wildlife refuge, *id.* § 27.61; litter, dispose, or dump any debris on national wildlife refuge lands, *id.* § 27.94(a); or "set[] on fire or caus[e[ to be set on fire any timber, brush, grass, or other inflammable material," *id.* § 27.95(a).

49.     The Service has authority "to protect fish and wildlife and their habitat and prevent their disturbance, to protect Service lands, property, facilities, or interests therein," *id.* § 28.21, to impose penalties for violations of regulations implementing the National Wildlife Refuge System Improvement Act, *id.* § 28.31, and to arrest or execute warrants against any person violating the Act, 16 U.S.C. § 668dd(g).

## II.     The National Historic Preservation Act

50.     The National Historic Preservation Act declares it a national policy to "administer federally owned, administered, or controlled historic property in a spirit of stewardship for the inspiration and benefit of present and future generations."  54 U.S.C. § 300101(3).  The head of each federal agency is responsible for "the preservation of historic property that is owned or

16

controlled by the agency." *Id.* at § 306101(a)(1).

51.    The National Historic Preservation Act established the Advisory Council on Historic Preservation to administer the Act.  54 U.S.C. §§ 304101(a), 304102(a).

52.    Under the National Historic Preservation Act, properties "of national historic significance" may be listed as National Historic Landmarks and included on the National Register.  54 U.S.C. § 302102.  A site can be designated as a National Historic Landmark only when it possesses "exceptional value or quality in illustrating or interpreting the heritage of the United States," and "possess[es] a high degree of integrity of location, . . . setting, . . . feeling and association."  36 C.F.R. § 65.4(a).

53.    To further the purposes of the National Historic Preservation Act, Congress mandated that agencies must "take into account the effect of the undertaking on any historic property" and "afford the Advisory Council on Historic Preservation a reasonable opportunity to comment with regard to the undertaking."  54 U.S.C. § 306108.  This is known as the "Section 106 process."  36 C.F.R. § 800.1(a).

54.    The goal of the Section 106 process is to "identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties."  *Id*.  The federal agency must ensure that the Section 106 process is initiated early in the undertaking's planning so that a broad range of alternatives may be considered during the planning process.  *Id*. at § 800.1(c). The term "undertaking" means "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including … those requiring a Federal permit, license, or approval." 54 U.S.C. § 300320(3).

55.    Prior to approving any federal undertaking that may adversely affect a National

Historic Landmark, the National Historic Preservation Act requires the agency to undertake such planning and actions as may be necessary to minimize harm to such landmark to the maximum extent possible. 54 U.S.C. § 306107. The agency must afford the ACHP a reasonable opportunity to comment with regard to the undertaking. *Id.*

56. When a federal undertaking may adversely affect a National Historic Landmark, the agency has an affirmative duty under the National Historic Preservation Act to minimize the harm done. 54 U.S.C. § 306107; 36 C.F.R. § 800.10(a). In addition, the agency must include the Secretary of the Interior in any consultation related to adverse effects to a National Historic Landmark. 36 C.F.R. § 800.10(c).

57. Pursuant to the National Historic Preservation Act, an agency may only exchange property owned by the agency "with comparable historic property." 54 U.S.C. § 306121(a)(2). And this may only occur if the agency determines that the exchange "will adequately ensure the preservation of the historic property. *Id.*

58. The transfer of federally owned property within a National Historic Landmark to a private party would constitute an adverse effect under the National Historic Preservation Agreement unless there are "adequate and legally enforceable restrictions or conditions to ensure long-term preservation" of the National Historic Landmark's significance. 36 C.F.R. § 800.5(a)(2)(vii).

III. **The National Environmental Policy Act**

59. The National Environmental Policy Act declares a "national policy … to promote efforts which will prevent or eliminate damage to the environment and biosphere." 42 U.S.C. § 4321. In recognition of the profound impact of human activities on the natural environment, including the profound influences of industrial expansion and resource exploitation, Congress

declared that it is the policy of the federal government to use all practicable means and measures to create and maintain conditions under which humans and nature can exist in productive harmony.  42 U.S.C. § 4331(a).

60.    To fulfill these purposes the National Environmental Policy Act sets forth "a set of action-forcing procedures" that: (1) require federal agencies take a "hard look" at the environmental impacts of their actions before they occur, thereby ensuring that "the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

61.    The National Environmental Policy Act requires federal agencies to prepare a detailed "environmental impact statement" when they propose to take "major federal action significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  The environmental impact statement must analyze the "reasonably foreseeable environmental effects of the proposed agency action," including "adverse" effects that "cannot be avoided should the proposal be implemented"; " a reasonable range of alternatives to the proposed agency action"; "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity"; and "any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented." 42 U.S.C. § 4332(2)(C)(i)-(v).

62.    An agency may prepare an "environmental assessment" for a proposed action that does not have a reasonably foreseeable significant impact on the environment, or if the

significance of such effect is unknown. 42 U.S.C. § 4336(b)(2). An environmental assessment must set forth the basis for an agency's "finding of no significant impact," or determination that an environmental impact statement is necessary. *Id.*

63.     Agencies must ensure the professional integrity, including the scientific integrity, of the discussion and analysis in an environmental document, including both environmental impact statements and environmental assessments. 42 U.S.C. § 4332(2)(D).

64.     Agencies must study, develop, and describe appropriate alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources. 42 U.S.C. § 4332(2)(H).

65.     The National Environmental Policy Act requires federal agencies to analyze both the probability of a given harm occurring and the consequences of that harm if it does occur. *New York v. Nuclear Regulatory Comm'n*, 681 F. 3d 471, 482 (D.C. Cir. 2012). Agencies cannot avoid their responsibility to consider future effects by claiming they are uncertain, because the National Environmental Policy Act requires some element of predictive behavior. *Sierra Club v. FERC*, 867 F.3d 1357, 1374 (D.C. Cir. 2017) ("NEPA analysis necessarily involves some 'reasonable forecasting,' and . . . agencies may sometimes need to make educated assumptions about an uncertain future.") (citation omitted).

## IV.     The Administrative Procedure Act

66.     The Administrative Procedure Act provides for judicial review of federal agency actions for persons adversely affected or aggrieved by the agency action. 5 U.S.C. § 702. Agency action made reviewable by statute and final agency action for which there is no other adequate remedy are subject to judicial review. *Id.* § 704.

67.     The Administrative Procedure Act requires a reviewing court to "compel agency

action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. § 706.

68.     An agency action is arbitrary and capricious if the agency relied on factors which Congress did not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *See Motor Vehicle Mfrs. Assoc. v State Farm*, 463 U.S. 29, 43 (1983).

69.     The Administrative Procedure Act's arbitrary and capricious standard requires that agency action must be reasonable and reasonably explained. *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 343-44 (D.C. Cir. 2019).  An agency violates this standard if it fails to consider all relevant factors raised by public comments. *Id*. at 344.

## FACTUAL BACKGROUND

## I.      The Lower Rio Grande Valley National Wildlife Refuge

70.     The Lower Rio Grande Valley National Wildlife Refuge, a vital component of the National Wildlife Refuge System, was established in 1979, with the purpose of "the development, advancement, management, conservation, and protection of fish and wildlife resources."  U.S. Fish and Wildlife Service, Lower Rio Grande Valley National Wildlife Refuge https://www.fws.gov/refuge/lower-rio-grande-valley (Jun. 9, 2026, 3:16 pm PT).  The Refuge is home to hundreds of species of birds, butterflies, and plants, and it provides critical habitat for species protected under both the Endangered Species Act and the Migratory Bird Treaty Act.

71.     In 1993, the Service added approximately 25,000 acres to the Lower Rio Grande Valley National Wildlife Refuge through the "Playa Del Rio and Coastal Corridor Additions,"

21

which included a considerable portion of the Lower Rio Grande Valley National Wildlife Refuge lands that it now seeks to give to SpaceX through the land exchange. U.S. Fish and Wildlife Service, Final Environmental Assessment, Proposed Playa Del Rio and Coastal Corridor Additions, Lower Rio Grande Valley National Wildlife Refuge (1993). These lands included clay lomas (dunes), wind tidal flats, and native brushland. Id. at 2. The Service found in 1993 that protecting these lands would preserve the last remnants of a unique native plant and animal community that has largely been lost in the Lower Rio Grande Valley. Id. at 7-9. The Service further found that adding these lands would provide a habitat link between the Lower Rio Grande Valley and Lagua Atascosa National Wildlife Refuges, and benefit several threatened and endangered species, including the piping plover and ocelot. Id. at 2, 5. These added lands also protected archeological and historic sites, including portions of the Palmito Hill Battlefield. Id. at 27, 34.

72.     In September 1997, the Service completed an Interim Comprehensive Management Plan for the Lower Rio Grande Valley and Santa Ana National Wildlife Refuges (hereinafter the "Plan"). The Service states that the Plan "is considered as an interim plan to cover a period of 5 to 10 years." Plan at 8. The Service states in the Plan that "land acquisition" is the emphasis for the Lower Rio Grande Valley National Wildlife Refuge. Id. at 9.

73.     The Plan identifies five goals for the Lower Rio Grande Valley National Wildlife Refuge: (1) the protection of biological diversity, land, and waters ; (2) the protection of water rights, water management and the management of wetlands; (3) the protection and improvement of water quality; (4) the protection of cultural resources; and (5) provide compatible wildlife dependent public uses, recreational opportunities, interpretation and education. Plan at 6-7.

74.     To achieve the biological diversity protection goal, the Plan's first objective is

22

land acquisition, including an "acquisition goal of 132,500 acres" for the Refuge; a minimum objective of adding 5,000 acres to the Refuge per year; and prioritizing the acquisition of lands that will "[p]rovide for the protection of endangered species," "[a]ssist in the achievement of a contiguous river wildlife corridor," and "[e]nlarge established brush tracts or create corridors connecting tracts of native habitat." Plan at 42.

75.    When Congress enacted the National Wildlife Refuge System Improvement Act in October 1997, it required the Service to prepare a "comprehensive conservation plan" for each National Wildlife Refuge "within 15 years after October 9, 1997." 16 U.S.C. § 668dd(e)(1)(B).

76.    According to the Service's 2001 Annual Narrative Report for the Lower Rio Grande Valley National Wildlife Refuge, the Refuge was still "in the process of protecting and connecting blocks of rare habitat that will undoubtedly serve as a model for future habitat conservation networks." U.S. Fish and Wildlife Service, Annual Narrative Report for the Lower Rio Grande Valley National Wildlife Refuge, iv (2001). The Service further explained that its priority was to "secure[] parcels that are directly adjacent to existing refuge lands and serve as links connecting separate tracts (the analogy being that of a chain, with even a single link missing, doesn't function)." Id.

77.    According to the 2001 report, the Plan for the Refuge "was subsequently converted into" a comprehensive conservation plan at an unspecified date. Id. at 4.

78.    The Service remains far from its goal of acquiring a total of 132,500 acres for the Lower Rio Grande Valley National Wildlife Refuge. The Refuge is still over 30,000 acres smaller than its intended size and it currently has less than 40,000 acres open for wildlife related

recreation, with an additional 6,000 acres open to hunting.[1]

## II.     The Palmito Ranch Battlefield National Historic Landmark

79.     The Lower Rio Grande Valley National Wildlife Refuge overlaps portions of the Palmito Ranch Battlefield National Historic Landmark.

80.     The Palmito Ranch Battlefield is the site of the final battle of the Civil War, which took place on May 12 and 13, 1865.  During the war, smugglers used the Rio Grande to avoid a Union blockade.  One month after General Robert E. Lee's surrender, Federal troops undertaking an invasion of South Texas encountered Confederate resistance near White's Ranch and Palmito Ranch.  During this engagement, the final shot in the war was fired at a site that has been recorded for posterity.

81.     In 1993, the Palmito Ranch Battlefield was listed in the National Register of Historic places under Criterion D (archaeology; information potential) and Criterion A (historic events) in Military History at the national level of significance.  National Park Service, Palmito Ranch Battlefield National Register of Historic Places Registration 6 (1993).  In 1997, the site received further recognition when it was designated as a National Historic Landmark. National Park Service, Palmito Ranch Battlefield National Historic Landmark Designation 9 (1997).

82.     According to the National Park Service's 1997 designation, "the Palmito Ranch Battlefield retains exceptional integrity of setting, feeling, association and location, nearly 130 years after the battle which occurred on May 12 and 13, 1865." Id. at 4.  The land "remains virtually unchanged since the mid-19th century due to inhospitable topographic and climatic conditions and lack of development," which "contributes to the battlefield's high level of historic

---

[1] U.S. Fish & Wildlife Service, Statistical Data Tables for Fish & Wildlife Service Lands (as of 9/30/2025) (June 9, 2026, 3:00 pm PT), https://www.fws.gov/sites/default/files/documents/2026-01/2025_annual_report_of_lands_data_tables-v2.pdf.

integrity." *Id.* Of the five documented Civil War battlefields in Texas, only the Palmito Ranch Battlefield still exhibits a good level of integrity. *Id.* at 6.

83. The National Park Service conducted a study in 2010, finding that more than 77 percent of the Palmito Ranch Battlefield's study area retained its historic integrity and that its landscape continued to reflect its association with the historic battle.

84. Today, there are multiple historic markers and viewing platforms with interpretative signage across the Palmito Ranch Battlefield National Historic Landmark.

**III.   SpaceX and its Environmental Impacts**

85. Space Exploration Technologies Corporation ("SpaceX") is a private aerospace company founded by billionaire Elon Musk in 2002.

86. In 2011, SpaceX identified the area near Boca Chica in Cameron County, Texas as a potential space shuttle launch site. In 2012, SpaceX began acquiring land in the area. In 2014, SpaceX announced it had selected the Boca Chica area as the location of its launch site.

87. In 2021, SpaceX CEO Elon Musk announced plans to incorporate a new city to be called Starbase. The city was planned to include the existing Boca Chica Village, the SpaceX test site and launch site, and more of the surrounding Boca Chica area. SpaceX submitted a petition in 2024 to Cameron County to formally incorporate the city of Starbase, which was approved on May 3, 2024. Formal incorporation occurred on May 20, 2025.

88. Over the past decade, SpaceX has constructed a manufacturing and testing facility and a rocket launch site at Boca Chica, and conducted numerous tests and launches—some of which resulted in catastrophic explosions propelling debris for miles, including concrete, metal,

and dust.[2]  According to SpaceX's CEO Elon Musk: "We've got a load of land with nobody around, so if it blows up, it's cool."[3]

89.    Post-explosion surveys have revealed significant damage to the surrounding refuge lands, including to the nests of protected bird species.  Now that these lands are purportedly "degraded," FWS is proposing to trade them away to the company that caused the problem, rather than exercising its ample enforcement authority to protect and restore those lands.  U.S. Fish and Wildlife Service, Final Environmental Assessment Lower Rio Grande Valley and Laguna Atascosa, National Wildlife Refuges Boca Chica Land Exchange 13 (2026); 16 U.S.C. § 668dd(g); 50 C.F.R. Part 27; id. § 28.21.  Moreover, the land exchange would allow for and facilitate the anticipated expansion of Starbase and SpaceX's operations, and thereby lead to further land-use conflicts down the road.[4]

90.    The Lower Rio Grande Valley National Wildlife Refuge has already suffered significant adverse impacts from adjacent industrial and residential development at the city of Starbase, and on properties owned by SpaceX.  These impacts have done significant damage to the host of endangered mammals, birds, and sea turtles that rely on the Refuge for habitat.

91.    SpaceX operations have led to road and Refuge closures that have prevented members of the Carrizo/Comecrudo Nation from accessing their ancestral lands for religious

---

[2] See e.g., Alejandra Yañez, Starship explodes during static fire test, rattling Cameron County residents, Valley Central, June 18, 2025, https://www.valleycentral.com/spacex/spacex-explosion-startles-cameron-county-residents/.

[3] Nancy Keates & Mark Maremont, Elon Musk's SpaceX Is Buying Up a Texas Village. Homeowners Cry Foul, Wall Street Journal, May 7, 2021, https://www.wsj.com/us-news/elon-musk-spacex-rocket-boca-chica-texas-starbase-11620353687.

[4] Kristen Mosbrucker-Garza, Starbase takes next step in massive expansion – here's what you need to know, Rio Grande Valley Business Journal, Mar. 18, 2026 (noting that Starbase seeks to "grow from 927 acres to nearly 8,000" acres), https://www.rgvbusinessjournal.com/news/18/03/2026/starbase-takes-next-step-in-massive-expansion-heres-what-you-need-to-know/.

ceremonies, prevented members of the public from visiting the area, and prevented scientists and Refuge staff from managing the site to encourage the recovery of protected species.

**IV.     The Boca Chica Land Exchange**

92.     The Service initiated discussions with SpaceX in 2023 regarding a potential land exchange. The lands within the Lower Rio Grande Valley National Wildlife Refuge that would be given to SpaceX through the exchange were initially acquired by the Service in the 1990s for the protection of their unique national resources, including endangered species habitat, coastal wetlands, and barrier islands.

93.     According to the Service, the surrounding area has experienced significant industrialization and development, particularly associated with the expansion of SpaceX facilities and related infrastructure. This increased industrial activity combined with the fragmented pattern of private inholdings has led to increased disturbance from noise and lights, and elevated levels of habitat fragmentation, which have harmed the Refuge.

94.     In March 2026, the Service issued a Draft Environmental Assessment proposing to "divest" 712 acres of the Lower Rio Grande Valley National Wildlife Refuge into SpaceX's private ownership. In exchange, SpaceX would provide 692 acres, most of which (476.4 acres) would be added to a different refuge. Overall, the proposed exchange would have resulted in a net loss of 235.6 acres for the Lower Rio Grande Valley National Wildlife Refuge and a 20-acre loss for the refuge system as a whole.

95.     The Service issued a Final Environmental Assessment and a Finding of No Significant Impact on June 1, 2026. The final decision increased the acres to be divested from the Lower Rio Grande Valley National Wildlife Refuge to 715 acres, and it decreased the private lands to be acquired from SpaceX to 683 acres.

96.     According to the Service, the lands proposed for acquisition through the exchange are in three general locations.  One set of parcels totals 112.7 acres located south of Starbase in an area known as "Las Palomas."  The Las Palomas parcels are surrounded by the Lower Rio Grande Valley National Wildlife Refuge, and there is no public access to these parcels without special permit.

97.     The second set of parcels to be acquired under the exchange, referred to as the "Laguna Unit," totals 477 acres, is located between the communities of Laguna Vista and Laguna Heights, along SH 100.

98.     The third set of parcels to be acquired under the exchange, referred to as the Boca Chica Beach Unit, includes 101.4 acres of inaccessible inholdings in the eastern portion of the Lower Rio Grande Valley National Wildlife Refuge.

99.     The 715 acres proposed for divestiture are comprised of undeveloped tidal marsh, saline prairie, costal thornscrub, mangrove-dominated edges, and wind-tidal flat habitats situated between expanding private development and refuge lands. These lands provide a diverse array of tidal and upland habitats that support ecological connectivity between Lower Rio Grande Valley National Wildlife Refuge lands and the Rio Grande corridor.

100.    The 715 acres proposed for divestiture include the 710 acre "Rio Parcels," which would create a large divide through a key component of the Refuge, separating this unit into two unconnected land areas.

101.    The Service asserts in its Final Environmental Assessment that the purpose of the proposed exchange is to consolidate National Wildlife Refuge System lands in Cameron County, Texas.  The Service states that the need is to reduce land use conflicts that impeded the Service's

28

mission to conserve species' habitats, improve habitat protection, consolidate ownership, and simplify management of refuge lands.

102.    The Service considered two alternatives within the Final Environmental Assessment:  the "no action" alternative, and the "proposed action" alternative.  The Service did not engage in detailed consideration of other reasonable alternatives or configurations for the Exchange, including an alternative that would require SpaceX to prevent future harm to Refuge lands or mitigate the harm it has already caused.

103.    The Service acknowledged in the Final Environmental Assessment that the lands proposed for divesture through the exchange would be developed and used by SpaceX for residential, commercial, institutional, infrastructure, and/or manufacturing activities.

104.    The Service did not provide any information in the Final Environmental Assessment supporting its claim that the lands that would be acquired under the exchange are presently under threat of development.

105.    The Service concluded that divestiture of Refuge lands "could impact ESA-listed species through reduction in foraging, dispersal, or breeding habitat quantity and/or quality; mortality due to vehicle collisions; displacement or alteration of behavior due to disturbances from light and/or noise; and exposure to hazardous chemicals from heavy machinery used during construction."

106.    In evaluating the Exchange in the Final Environmental Assessment, the Service failed to take the required "hard look," and failed to ensure the scientific integrity of its analysis, for a number of issues and factors, including but not limited to:

        a.   The Service, in collaboration with SpaceX, developed a system for evaluating the habitat quality of the parcels to be exchanged using

"Biological Importance Scores." In the Draft Environmental Assessment, the Service determined that the lands proposed for divesture were of poor (497 acres) and medium quality (215 acres), while the lands proposed for acquisition were high quality (692 acres). However, while the Final Environmental Assessment changes the number of acres to be divested and acquired from the draft version, it does not clearly identify the Biological Importance Scores applicable to those lands. Moreover, the Biological Scores for these parcels set forth in the Proposed Environmental Assessment—and apparently informing the decision to finalize the exchange—are contradicted by the Service elsewhere in the record, and lack scientific support.

b.  The Service failed to take a hard look at the impacts to the Lower Rio Grande Valley National Wildlife Refuge from giving 715 acres of this Refuge to SpaceX. More specifically, the Service failed to meaningfully consider that SpaceX activities are already degrading this Refuge, which will substantially increase by allowing SpaceX to significantly expand its operations and activities into the heart of the Refuge.

c.  Relatedly, the Service failed to show that the proposed action will satisfy the stated purpose and need for this proposal, as giving over 700 acres of the Lower Rio Grande Valley National Wildlife Refuge to SpaceX will only further fragment the wildlife habitat within this Refuge, and further increase the land use conflicts between SpaceX and the Refuge.

d.  Finally, the Service failed to analyze whether a third alternative set forth

30

in comments—namely, relying on the Service's statutory and regulatory enforcement authorities to prevent future land use conflicts and degradation of Refuge lands from SpaceX's activities, and require that SpaceX mitigate past harms to the Refuge from explosions and other industrial activities—would better serve the purpose and need for the project.

107. In preparation for the Exchange, the Service commissioned a cultural resource survey by the organization SEARCH. This survey noted that "[t]he landscape of the battlefield had remained largely unchanged since the mid-nineteenth century due largely to its lack of development. For this reason, the landscape contributed to the battlefield's historic integrity because it conveys the visual sense of the area as it must have appeared to the soldiers in 1865."

108. As part of the review process for this Exchange, the Service was required to meaningfully consult with the Secretary of the Interior. The Service has not published any record of is consultation with the Secretary.

109. The Programmatic Agreement, which would govern the transfer of land to SpaceX, includes protections for historic resources on only 10 acres, out the nearly 703 acres of the National Historical Landmark that would be withdrawn from public ownership. SpaceX would be free to develop the remaining roughly 693 acres of this nationally significant battlefield and National Historic Landmark site "for residential, commercial, institutional, infrastructure, and manufacturing activities that are currently undefined."

110. On March 31, 2026, the Center for Biological Diversity, Save RGV, the Carrizo/Comecrudo National of Texas, and South Texas Environmental Justice Network submitted detailed comments on the Draft Environmental Assessment.

31

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**The Service failed to demonstrate that the land exchange would provide a net conservation benefit to the Lower Rio Grande Valley National Wildlife Refuge, and further the Refuge's purposes, in violation of the National Wildlife Refuge System Improvement Act.**

111.    The preceding paragraphs are incorporated herein by reference.

112.    The National Wildlife Refuge System Improvement Act requires the Service to manage each Refuge "to fulfill the mission of the System, as well as the specific purposes for with that refuge was established." 16 U.S.C. § 668dd(a)(3)(A).  The Service must ensure that the mission of the National Wildlife Refuge System and the purposes of each Refuge are carried out. 16 U.S.C. § 668dd(a)(4)(D).  If a conflict exists between the purposes of an individual refuge and the mission of the System, the Service must resolve the conflict in a manner that first protects the purposes of the individual refuge.  *Id*.

113.    The Service is authorized to acquire lands by exchange for acquired lands under its jurisdiction which it finds to be suitable for disposition.  16 U.S.C. § 668dd(b)(3).  The values of the properties must be approximately equal, or must be equalized by the payment of cash.  *Id*.

114.    In considering a land exchange, the Service must prepare a written record that clearly demonstrates how the exchange would satisfy the following criteria: (a) the exchange must further the purposes for which the refuge was established; (b) the exchange must fulfill the National Wildlife Refuge System's conservation mission; and (c) the exchange must provide a net conservation benefit to the refuge.  342 FW 5.7(B)(2).  A refuge land exchange must therefore "provide a conservation benefit to the refuge, and further the individual refuge's purposes."  Solicitor Memo at 6.

115.    The Service has failed to demonstrate that the Boca Chica Land Exchange would

32

provide a conservation benefit to the Lower Rio Grande Valley National Wildlife Refuge and

further the purposes of the Refuge.  To the contrary, as the Service acknowledges, trading away

715 acres of this Refuge to SpaceX would further degrade and fragment this Refuge.  The

Service has also failed to demonstrate that the Boca Chica Land Exchange would provide a

conservation benefit to the National Wildlife Refuge System as a whole.  The Service has

thereby failed to comply with the National Wildlife Refuge System Improvement Act in

approving and authorizing the land exchange.  16 U.S.C. §§ 668dd(a)(3)(A), 668dd(a)(4)(D),

668dd(b)(3); 342 FW 5.7(B)(2).

116.    The Service's decision to approve the Boca Chica Land Exchange is arbitrary,

capricious, an abuse of discretion, and not in accordance with the National Wildlife Refuge

System Improvement Act.  5 U.S.C. § 706(2)(A).  The Service's Decision Notice for the Boca

Chica Land Exchange should be held unlawful and set aside.  *Id*.

**SECOND CLAIM FOR RELIEF**

**<u>The Service failed to demonstrate that the land exchange is consistent with the 1997 Interim Comprehensive Management Plan for the Lower Rio Grande Valley National Wildlife Refuge, in violation of the National Wildlife Refuge System Improvement Act.</u>**

117.    The preceding paragraphs are incorporated herein by reference.

118.    Pursuant to the National Wildlife Refuge System Improvement Act, the Service

must manage the Lower Rio Grande Valley National Wildlife Refuge in a manner that is

consistent with the comprehensive conservation plan for the refuge.  16 U.S.C. 668dd(e)(1)(E).

119.    When the Service completed the 1997 Interim Comprehensive Management Plan

for the Lower Rio Grande Valley National Wildlife Refuge, the refuge totaled 64,149 acres.

120.    The Service's "vision" in the 1997 Plan was as follows:

The Lower Rio Grande Valley Refuge will someday be 132,500 acres of mostly
contiguous tracts of natural brush, reforested farmland and wetlands.  The future is one of

33

land acquisition, habitat restoration, wetland recovery, and compatible wildlife dependent recreation where the American public can enjoy this rare treasure.

121.    Thus, the Service's primary goal in the 1997 Plan was for "land acquisition." More specifically, the Service sought to "[c]ontinue to pursue acquisition goal of 132,500 acres for the Lower Grande Valley NWR by purchasing fee title lands or conservation easements within the river corridor from willing sellers and other lands within the four county area that will contribute to the preservation and enhancement of any of the 11 biotic communities.  Close escrow on approximately 5,000 acres per year."

122.    The 1997 Plan directed the Service to acquire lands that will (1) provide for the protection of endangered species; (2) assist in the achievement of a contiguous river wildlife corridor; (3) enlarge established brush tracts or create corridors connecting tracts of native habitat; (4) enhance or connect existing refuge tracts not on or near the river; and (5) protect isolated tracts of desired habitat.

123.    The Service has failed to demonstrate how transferring 715 acres of the Lower Rio Grande Valley National Wildlife Refuge to SpaceX is consistent with this primary goal of land acquisition within the 1997 Plan.  The Service has thereby failed to comply with the National Wildlife Refuge System Improvement Act in approving and authorizing the land exchange.  16 U.S.C. § 668dd(e)(1)(E).

124.    The Service's decision to approve the Boca Chica Land Exchange is arbitrary, capricious, an abuse of discretion, and not in accordance with the National Wildlife Refuge System Improvement Act.  5 U.S.C. § 706(2)(A).  The Service's Decision Notice for the Boca Chica Land Exchange should be held unlawful and set aside.  *Id*.

**THIRD CLAIM FOR RELIEF**

**The Service has failed to revise and update the 1997 Interim Comprehensive Management**

**Plan for the Lower Rio Grande Valley National Wildlife Refuge, in violation of the National Wildlife Refuge System Improvement Act.**

125.    The preceding paragraphs are incorporated herein by reference.

126.    The National Wildlife Refuge System Improvement Act requires the Service to prepare a "comprehensive conservation plan" for each National Wildlife Refuge.  16 U.S.C. § 668dd(e)(1)(A)(i).  Upon completion of the comprehensive conservation plan, the Service must manage the refuge in a manner that is consistent with the plan.  16 U.S.C. § 668dd(e)(1)(E).

127.    The Service must revise a comprehensive conservation plan at least every 15 years.  16 U.S.C. § 668dd(e)(1)(A)(iv).  The Service must also revise a comprehensive conservation plan if it determines that the conditions that affect the refuge have changed significantly.  16 U.S.C. § 668dd(e)(1)(E).

128.    It has been nearly 30 years since the Service completed the "Interim Comprehensive Management Plan" for the Lower Rio Grande Valley National Wildlife Refuge.  At the time the 1997 interim management plan was prepared, the Service intended that it would be in place for 5 to 10 years.

129.    The conditions that affect the Lower Rio Grande Valley National Wildlife Refuge have changed significantly since 1997.  For instance, in 1997, neither SpaceX nor the town of Starbase existed.  SpaceX and the surrounding town and development are now the most prominent threat to the Refuge.  Additionally, climate change over the past 30 years has also significantly increased and also poses a threat to the Refuge that is unaddressed in the 1997 plan.

130.    The Service's ongoing failure to revise the 1997 Interim Comprehensive Management Plan for the Lower Rio Grande Valley National Wildlife Refuge violates the National Wildlife Refuge System Improvement Act.  16 U.S.C. §§ 668dd(e)(1)(A)(iv), 668dd(e)(1)(E).

35

131.    The Service's ongoing failure to revise the 1997 Interim Comprehensive Management Plan for the Lower Rio Grande Valley National Wildlife Refuge constitutes agency action unlawfully withheld and unreasonably delayed. 5 U.S.C. § 706(1). The Court should compel the Service to promptly prepare a revised comprehensive conservation plan that is in full compliance with the National Wildlife Refuge System Improvement Act. *Id*.

### FOURTH CLAIM FOR RELIEF

**The Service failed to ensure that it would receive comparable historic property in exchange for over 700 acres of the Palmito Ranch Battlefield National Historic Landmark, and that the Exchange would adequately ensure preservation of the historic property, in violation of the National Historic Preservation Act.**

132.    The preceding paragraphs are incorporated herein by reference.

133.    The Service may only make an exchange if a) the action would exchange historic property for "comparable historic property" and b) if the agency determines that the exchange would "adequately ensure the preservation of the historic property." 54 U.S.C. § 306121(a)(2).

134.    Even though the Exchange would transfer over 700 acres of the Palmito Ranch Battlefield National Historic Landmark to SpaceX, the Service failed to ensure that the Exchange would result in the acquisition of "comparable historic property." 54 U.S.C. § 306121(a)(2). The Service also failed to demonstrate that the Exchange would "adequately ensure the preservation" of the Palmito Ranch Battlefield National Historic Landmark. *Id.*

135.    In developing and authorizing the Exchange, the Service further failed "to the maximum extent possible [to] undertake such planning and actions as may be necessary to minimize harm to the landmark." 54 U.S.C. § 306107; 36 C.F.R. § 800.10(a).

136.    The Service thereby failed to demonstrate and ensure that the Exchange will satisfy the mandatory requirements of the National Historic Preservation Act. 54 U.S.C. §§ 306107, 306108, 306121(a)(2), 36 C.F.R. 800.10.

137.    The Service's decision to approve the Boca Chica Land Exchange is arbitrary, capricious, an abuse of discretion, and not in accordance with the National Historic Preservation Act.  5 U.S.C. § 706(2)(A).  The Service's Decision Notice for the Land Exchange should be held unlawful and set aside.  *Id.*

### FIFTH CLAIM FOR RELIEF

**<u>The Service failed to take the required "hard look," and ensure the scientific integrity of its Environmental Assessment, in violation of the National Environmental Policy Act</u>**

138.    The preceding paragraphs are incorporated herein by reference.

139.    In determining whether to prepare an environmental impact statement or issue a Finding of No Significant Impact, an agency must take a "hard look" at the environmental consequences of a proposed action within an environmental assessment.

140.    The National Environmental Policy Act requires the Service to utilize an interdisciplinary approach to ensure the integrated use of the natural and social sciences in its planning and decisionmaking.  42 U.S.C. § 4332(2)(A).  The Service must ensure the professional integrity, including scientific integrity, of the decision and analysis in an environmental assessment.  *Id*. § 4332(2)(D).  The Service must also make use of reliable data and resources.  *Id*. § 4332(2)(E). Finally, the Service must study, develop, and describe appropriate alternatives to recommend courses of action.

141.    The Service failed to study, develop, and describe appropriate alternatives, failed to take the required hard look, failed to ensure the scientific integrity of its analysis, and failed to use reliable data and resources, within the Environmental Assessment.  The Service has thereby failed to comply with the National Environmental Policy Act in analyzing the proposed land exchange.  42 U.S.C. §§ 4332(2)(A), 4332(2)(D), 4332(2)(E).

142.    The Service's decision to approve the Boca Chica Land Exchange is arbitrary,

capricious, an abuse of discretion, and not in accordance with the National Environmental Policy

Act. 5 U.S.C. § 706(2)(A). The Service's Decision Notice for the Land Exchange should be

held unlawful and set aside. *Id*.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request that this Court:

A.    Declare that the Service violated the National Wildlife Refuge System Improvement Act, National Historic Preservation Act, National Environmental Policy Act, and Administrative Procedure Act in developing and approving the Boca Chica Land Exchange;

B.    Set aside the Service's decision approving the Boca Chica Land Exchange;

C.    Enjoin the Service from implementing the Boca Chica Land Exchange;

D.    Declare that the Service is in ongoing violation of the National Wildlife Refuge System Improvement Act for failing to update and revise and the Comprehensive Conservation Plan for the Lower Rio Grande Valley National Wildlife Refuge;

E.    Compel the Service to update and revise the Comprehensive Conservation Plan for the Lower Rio Grande Valley National Wildlife Refuge by a date certain;

F.    Award to Plaintiffs their costs, expenses, and reasonable attorney fees pursuant to applicable law including the Equal Access to Justice Act, 28 U.S.C. § 2412; and

G.    Grant Plaintiffs such further relief as may be just, proper, and equitable.

Dated  June 10, 2026

/s/ Ivan R. Ditmars
Ivan R. Ditmars (D.C. Bar No. CA00243)
Center for Biological Diversity
2100 Franklin St., Suite 305
Oakland, CA 94612
Phone: 510-844-7158
Email: iditmars@biologicaldiversity.org

Brandon Jones-Cobb (WA Bar No. 64828)
Center for Biological Diversity
P.O. Box 30604
Seattle, WA 98113-0604
Phone: 564-397-0830, ext. 478
Email: bjonescobb@biologicaldiversity.org
*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiffs*