**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; SAVE RGV; THE CARRIZO/COMECRUDO NATION OF TEXAS, INC.; and SOUTH TEXAS ENVIRONMENTAL JUSTICE NETWORK, <br><br> *Plaintiffs,* <br><br> v. <br><br> BRIAN NESVIK, in his official capacity as Director of the United States Fish and Wildlife Service, and UNITED STATES FISH AND WILDLIFE SERVICE, an agency within the United States Department of the Interior, <br><br> *Defendant*, <br><br> and <br><br> SPACE EXPLORATION TECHNOLOGIES CORP. <br><br> *Defendant-Intervenor.* | Case No. 1:26-cv-02053-JDB <br><br> MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |

i

TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ..................................................................................................................... 1

LEGAL BACKGROUND .......................................................................................................... 3

    I.      THE NATIONAL HISTORIC PRESERVATION ACT ............................................. 3

    II.    THE NATIONAL WILDLIFE REFUGE SYSTEM IMPROVEMENT ACT ......... 5

    III.   THE NATIONAL ENVIRONMENTAL POLICY ACT ........................................ 6

FACTUAL BACKGROUND ..................................................................................................... 7

    I.      Lower Rio Grande National Wildlife Refuge ............................................... 7

    II.    Palmito Ranch Battlefield National Historic Landmark ............................. 10

    III.   SpaceX's Decision to Move into the Heart of the Refuge. .................................. 12

    IV.   The Service's approval of the Land Exchange. ...................................................... 13

    V.    SpaceX's Imminent Plans to Build Industrial and/or Residential Infrastructure on Refuge Lands. ................................................................................................ 16

STANDARDS OF REVIEW .................................................................................................... 17

    I.      Preliminary Injunction Standard ................................................................ 17

    II.    Standard for Review of the Merits ............................................................. 18

ARGUMENT .......................................................................................................................... 18

    I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS..................... 18

        A.   Plaintiffs Have Standing to Challenge the Exchange. ........................................ 19

        B.   The Service violated the National Historic Preservation Act because it is not receiving comparable historic property through the exchange, and it is not ensuring preservation of the Historic Landmark that it is giving to SpaceX. ....... 20

            1.   The Service failed to ensure that it would receive comparable historic property in exchange for over 700 acres of the Palmito Ranch Battlefield National Historic Landmark ................................................................................ 21

            2.   The Service did not ensure the Exchange would adequately preserve historic property. .............................................................................................. 21

            3.   The Service's suggestion that Section 111 of the NHPA is "optional" violates the unequivocal language of the statute.................................................. 24

        C.   The Service violated the National Wildlife Refuge System Improvement Act because the land exchange will not further the purposes of or benefit the Refuge and is inconsistent with the Service's management plan for the Refuge. .............. 25

        D.   The Service is in ongoing violation of the National Wildlife Refuge System Improvement Act by failing to prepare an up-to-date Comprehensive Conservation Plan for the Refuge. .......................................................................... 30

        E.   The Service violated NEPA by ignoring reasonable alternatives to the exchange. .. 32

II.     PLAINTIFFS' INTERESTS WILL BE IRREPARABLY HARMED ABSENT THE REQUESTED PRELIMINARY INJUNCTION. ........................................... 35

III.    THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH IN FAVOR OF AN INJUNCTION .................................................................. 41

IV.     PLAINTIFFS REQUEST THE COURT WAIVE ANY BOND REQUIRE-MENT. ........................................................................................................... 44

V.      CONCLUSION................................................................................................... 45

TABLE OF AUTHORITIES

**Cases**

*American Motorcyclist Ass'n v. Watt*, 714 F.2d 962 (9th Cir. 1983) ..........................................42

*Amoco Prod. v. Vill. of Gambell*, 480 U.S. 531 (1987) ............................................................35, 42

*Apache Stronghold v. United States*, No. 21-15295, 2021 WL 12295173 (9th Cir. March 5, 2021) ......................................................................................................................................38

*Ariz. Mining Reform Caol. v. U.S. Forest Serv.*, 172 F. 4th 641 (9th Cir. 2026) ........................37

*Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84 (D.C. Cir. 2020) ......................................18, 27

*Ctr. for Biological Diversity v. Fed. Aviation Admin.*, 804 F. Supp. 3d 86 (D.D.C. 2025) ..............................................................................................................................12, 13, 34

*Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356 (D.C. Cir. 2026)........................................18

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) ...............................................................................18

*City of Berkeley v. United States Postal Serv.*, No. C 14-04916 WHA, 2015 WL 1737523 (N.D. Cal. Apr. 14, 2015) ..............................................................................................................23, 45

*Comm. for the Pres. of the Seattle Fed. Reserve Bank Bldg. v. Fed. Reserve Bank of San Francisco*, No. 08-1700, 2010 WL 1138407 (W.D. Wash. Mar. 19, 2010).................................23

*Desert Citizens Against Pollution v Bisson*, 231 F.3d 1172 (9th Cir. 2000) ..........................19, 37

*DSE, Inc. v. United States*, 169 F.3d 21 (D.C. Cir. 1999) ..............................................................44

*Friends of the Earth US v. Exp.-Imp. Bank of United States*, No. 1:25-cv-02235, 2025 U.S. Dist. LEXIS 256674 (D.D.C. Oct. 10, 2025) ......................................................................................38

*Friends of the Earth, Inc. v. Laidlaw Envrtl. Servs., Inc.*, 528 U.S. 167 (2000) ..........................19

*Glob. Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025)......................................................17

*Great Basin Res. Watch v. Burgum*, No. 3:26-cv-00378-MMD-CLB, slip op. (D. Nev. July 16, 2026) .........................................................................................................................................36

*Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078 (D.C. Cir. 2011) ..............................................................................................................18

*Kettle Range Conservation Group v. United States Bureau of Land Mgmt.*, 150 F.3d 1083 (9th Cir. 1998) ..................................................................................................................................45

*League of Wilderness Defs. v. Connaughton*, 752 F.3d 755 (9th Cir. 2014)................................42

*League of Women Voters of the United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)................35

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ........................................................18, 24

*Massachusetts v. EPA*, 549 U.S. 479 (2007) ................................................................19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ......................18

*Nat. Assoc. for the Advancement of Colored People v. Fed. Power Comm'n*, 425 U.S. 662 (1976) ................................................................................................41

*Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075 (2019) ................................35

*Nat'l Council for Adoption v. Blinken*, 4 F.4th 106 (D.C. Cir. 2021) ................................19

*Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075 (D.C. Cir. 2019) ................................22

*Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167 (D.D.C. 1971) ................................44

*N. America's Bldg. Trades Unions v. Dept. of Def.*, 783 F. Supp. 3d 290 (D.D.C. 2025) ............44

*P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020) ................................44

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ................................6

*Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669 (5th Cir. 1992) ................................43

*San Carlos Apache Tribe v. United States Forest Serv.*, 803 F. Supp. 3d 879 (D. Ariz. 2025) ....37

*Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168 (2025) ................................34, 35

*Sierra Club v. Army Corps of Eng'rs*, 990 F. Supp. 2d 9 (D.DC. 2013) ................................35

*Simms v. District of Columbia*, 872 F. Supp. 2d 90 (D.D.C. 2012) ................................44

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ................................19

*Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021) ................................41

*Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981) ................................17, 35

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ................................17

*Yakus v. United States*, 321 U.S. 414 (1944) ................................41

**Statutes**

5 U.S.C. § 706 ................................18

16 U.S.C. § 668dd ................................5, 6, 9, 25, 26, 29, 30, 31

16 U.S.C. § 703 *et seq.* ................................7

16 U.S.C. § 1531 *et seq.* ................................7

16 U.S.C. § 742f ................................7

42 U.S.C. § 4321 ................................6

42 U.S.C. § 4331 ................................6

42 U.S.C. § 4332 ................................6, 7, 32

42 U.S.C. § 4336 ................................7

54 U.S.C. § 300101 ................................3, 43

54 U.S.C. § 300308 ................................4

54 U.S.C. § 302102 ................................4

54 U.S.C. § 304101 ................................4

54 U.S.C. § 306101 ................................3, 21

iv

54 U.S.C. § 306107 ................................................................................................4, 22

54 U.S.C. § 306108 ...........................................................................................4, 21, 22

54 U.S.C. § 306121 ........................................................1, 4, 15, 20, 21, 23, 24, 25

Public Law 105-57 (Oct. 9, 1997) ..............................................................................5

Public Law 96-515 (Dec. 12, 1980) ..........................................................................43

## Regulations

36 C.F.R. § 65.4 ..........................................................................................................4

36 C.F.R. § 800.1 ........................................................................................................4

36 C.F.R. § 800.5 ........................................................................................................4

36 C.F.R. § 800.6 ........................................................................................................4

36 C.F.R. § 800.7 ........................................................................................................4

36 C.F.R. § 800.10 ......................................................................................................4

50 C.F.R. § 27.51 ......................................................................................................33

50 C.F.R. § 27.61 ......................................................................................................33

50 C.F.R. § 28.21 ......................................................................................................33

50 C.F.R. § 29.13 ......................................................................................................33

## Other Authorities

342 FW 5, § 5.7 ...................................................................................................25, 27

U.S. Dept. of Interior Office of the Solicitor, M-37078, National Wildlife Refuge Land Exchanges, May 31, 2023, ....................................................................................26

INTRODUCTION

Congress has imposed strict protections for the federal public lands at issue in this suit, both because the Lower Rio Grande Valley National Wildlife Refuge contains ecological treasures unique within the National Wildlife Refuge System, and because the Palmito Ranch Battlefield National Historic Landmark serves as a monument to the famous final land battle of the Civil War. The U.S. Fish and Wildlife Service ("Service") has decided to give 727 acres of the Refuge, including over 700 hundred acres of the National Historic Landmark, to Space Exploration Technologies Corp. ("SpaceX"), in exchange for lands elsewhere, in violation of the federal laws meant to protect these important ecological and historical resources.

Plaintiffs Center for Biological Diversity, Save RGV, the Carrizo/Comecrudo Nation of Texas, Inc., and South Texas Environmental Justice Network expect the land exchange ("Exchange") will be executed within weeks. Thus, without a preliminary injunction, 727 acres of the Lower Rio Grande Valley Wildlife Refuge will be transferred to SpaceX, with the company then able to immediately commence construction activities that will irreversibly degrade habitat relied upon by multiple protected wildlife species, and irreparably damage a nationally significant historic landmark. To preserve the status quo and to prevent irreparable harm to Plaintiffs, the Refuge, and the Landmark, Plaintiffs respectfully request the Court issue a preliminary injunction pausing the Exchange pending full review of the merits of the case.

Plaintiffs are likely to prevail on the merits. First, the Service violated the plain language of the National Historic Preservation Act (NHPA), which only authorizes the Service to exchange property owned by the agency if two requirements are satisfied: (1) the property must be exchanged "with comparable historic property," and, even then, (2) only "if the agency head determines that the … exchange will adequately ensure the preservation of the historic property."

1

54 U.S.C. § 306121(a)(2). This Exchange meets neither of these criteria. The Service has made no effort to show that the lands to be acquired provide historic value that is remotely "comparable" to the designated National Historic Landmark, made famous as the site of the last shots fired in the Civil War. In addition, the Service fails to ensure the Landmark's preservation after the Exchange, instead only providing for minimal deed restrictions within approximately *10* acres, out of the *703* acres of the Landmark to be divested. By permitting SpaceX to destroy the remaining 693 acres of this nationally recognized historic property—and without requiring SpaceX to provide "comparable" historic property in return—the Service has flagrantly violated the NHPA. That is alone sufficient to issue preliminary injunctive relief given the devastation of a unique national treasure that would otherwise occur during the ordinary course of litigation.

Second, the National Wildlife Refuge System Improvement Act ("Refuge Act") only allows exchanges of refuge land when that exchange furthers the purpose of the refuge and provides the refuge a net conservation benefit. The Service acted arbitrarily by approving a land exchange here that accomplishes neither goal for the Lower Rio Grande Valley National Wildlife Refuge. These shortcomings are compounded by the Service's failure to comply with its own management plan for the Refuge. Not only has the Service failed to show that the Exchange is compatible with its "Interim Comprehensive Management Plan," it has also failed to update that plan since 1997, despite statutory requirements to update the plan at least every 15 years and whenever "the conditions that affect the refuge have changed significantly."

Third, the Service violated the National Environmental Policy Act (NEPA) in the process of approving this Exchange. NEPA requires agencies to consider a reasonable range of alternatives that would satisfy the purpose and need for a project. Here, the Service failed to consider simply relying on existing statutory authorities to prevent SpaceX from further

2

degrading public lands and require it to mitigate past harm. This would alleviate the "land use conflicts" motivating the Exchange without necessitating a giveaway to the very corporation that chose the Refuge area as the base for its operations and damaged the Refuge through those operations. By relying on an inadequate NEPA analysis, the Service committed itself to an uninformed decision and failed to inform the public about the environmental impacts of a highly controversial land exchange in an internationally renowned wildlife and historic destination.[1]

Plaintiffs will suffer immediate and irreparable harm if the Exchange proceeds, as the lands would be privatized and Plaintiffs' members forbidden from further using and enjoying these lands. Moreover, SpaceX could immediately excavate and begin construction, irrevocably harming this historic property, and the sensitive and ecologically valuable wildlife habitat. By contrast, delaying the Exchange while the Court resolves the merits would cause no harm to the Service, and minimal harm to SpaceX. Thus, the balance of interests, as well as the public interest, strongly favor a pause on the Exchange while the Court adjudicates Plaintiffs' claims.

LEGAL BACKGROUND

I.      THE NATIONAL HISTORIC PRESERVATION ACT

The National Historic Preservation Act (NHPA) declares it a national policy to "administer federally owned, administered, or controlled historic property in a spirit of stewardship for the inspiration and benefit of present and future generations." 54 U.S.C. § 300101(3). Under the NHPA, "[t]he head of each Federal agency shall assume responsibility for the preservation of historic property that is owned or controlled by the agency." *Id.* § 306101(a)(1). A "historic property" is "any prehistoric or historic district, site, building,

---

[1] During the twenty-nine days made available for public comment, the Service reports it received "over 25,000 comments." Ex. 1, at 4.

3

structure, or object included on, or eligible for inclusion on, the National Register, including artifacts, records, and material remains relating to the district, site, building, structure, or object." *Id.* § 300308. The NHPA thus requires each federal agency to take responsibility for the impact that its activities may have upon historic resources and establishes the Advisory Council on Historic Preservation ("the Advisory Council") to help administer the Act. *Id.* § 304101(a).

Under the NHPA, properties "of national historic significance" may be listed as National Historic Landmarks and included on the National Register. *Id.* § 302102. A site can be designated as a National Historic Landmark only when it possesses "exceptional value or quality in illustrating . . . the heritage of the United States," and "a high degree of integrity of location, . . . setting, . . . feeling and association." 36 C.F.R. § 65.4(a). National Historic Landmarks receive increased protection under the NHPA, which requires each agency "to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark," including both direct and indirect effects. 5 4 U.S.C. §§ 306107, 306121; 36 C.F.R. § 800.10(a) (setting forth "[s]pecial requirements for protecting National Historic Landmarks" and requiring "special consideration to protecting National Historic Landmarks").

Pursuant to the NHPA, an agency may only exchange historic property owned by the agency "with comparable historic property." 54 U.S.C. § 306121(a)(2). Even then, an exchange of comparable properties may only occur if the agency determines that the exchange "will adequately ensure the preservation of the historic property." *Id*. Moreover, any transfer of federally owned property within a National Historic Landmark to a private party would constitute an adverse effect under the NHPA unless there are "adequate and legally enforceable restrictions or conditions to ensure long-term preservation" of the National Historic Landmark's significance. 36 C.F.R. § 800.5(a)(2)(vii).

4

II.    THE NATIONAL WILDLIFE REFUGE SYSTEM IMPROVEMENT ACT

The National Wildlife Refuge System Administration Act of 1966 established the National Wildlife Refuge System. 16 U.S.C. § 668dd. The National Wildlife Refuge System is administered by the Service, and it is the only category of federal lands that is administered primarily for the conservation of wildlife. 16 U.S.C. § 668dd(a)(1).

In 1997, Congress enacted the National Wildlife Refuge System Improvement Act ("Refuge Act"), which significantly amended the National Wildlife Refuge Administration Act. Public Law 105-57 (Oct. 9, 1997). Under the Refuge Act, the mission of the National Wildlife Refuge System is to administer a network of lands and waters for the conservation, management, and, where appropriate, restoration of fish, wildlife, and plant resources and their habitats for the benefit of present and future generations. 16 U.S.C. § 668dd(a)(2). The Refuge Act required the Service to prepare a "comprehensive conservation plan" for each National Wildlife Refuge within 15 years. 16 U.S.C. § 668dd(e)(1)(B). The Service must then revise each plan at least every 15 years, as may be necessary. *Id.* § 668dd(e)(1)(A)(iv). The Service must also revise a comprehensive conservation plan if it determines that the surrounding conditions that affect the Refuge have changed significantly. *Id.* § 668dd(e)(1)(E). Upon completion of a comprehensive conservation plan, the Service must manage the Refuge in a manner consistent with the plan. *Id.*

In administering the National Wildlife Refuge System, the Service may acquire new lands via the exchange of existing public lands, but only if the lands to be disposed are "suitable for disposition." 16 U.S.C. § 668dd(b)(3). In administering the National Wildlife Refuge System, the Service must manage each refuge to fulfill the mission of the National Refuge System as a whole, as well as for the specific purposes for which that individual Refuge was established. 16 U.S.C. § 668dd(a)(3)(A). If there is a conflict between the purposes of an individual Refuge and

5

the mission of the overall National Refuge System, the conflict must be resolved in a manner that first protects the purposes of the individual Refuge. 16 U.S.C. 668dd(a)(4)(D). This requirement to prioritize the purposes for which each Refuge was established over the System as a whole also applies to land exchange decisions. *Id.*; *see also* Ex. 15, at 4-5.

III.    THE NATIONAL ENVIRONMENTAL POLICY ACT

The National Environmental Policy Act (NEPA) declares a national policy to promote efforts which will prevent or eliminate damage to the environment. 42 U.S.C. § 4321. In recognition of the profound impact of human activity on the natural environment, Congress declared that it is the policy of the federal government to use all practicable means to create and maintain conditions under which humans and nature can exist in productive harmony. 42 U.S.C. § 4331(a). To fulfill these purposes, NEPA requires that: (1) federal agencies take a "hard look" at the environmental impacts of their actions before they occur, thereby "ensur[ing] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

NEPA requires federal agencies to prepare a detailed "environmental impact statement" when they propose to take "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C). The statement must analyze the "reasonably foreseeable environmental effects of the proposed agency action," including "adverse" effects that "cannot be avoided should the proposal be implemented"; "a reasonable range of alternatives to the proposed agency action"; "the relationship between local short-term uses of man's environment

6

and the maintenance and enhancement of long-term productivity"; and "any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented." 42 U.S.C. § 4332(2)(C)(i)-(v).

Agencies may instead prepare an "environmental assessment" for a proposed action that does not have a reasonably foreseeable significant impact on the environment, or if the significance of such effect is unknown. 42 U.S.C. § 4336(b)(2). An environmental assessment must set forth the basis for an agency's "finding of no significant impact," or determination that an environmental impact statement is necessary, *id.*, as well as a range of "appropriate alternatives," *id.* § 4332(2)(H).

FACTUAL BACKGROUND

I.    <u>Lower Rio Grande National Wildlife Refuge</u>

In 1979, the Service established the Lower Rio Grande Valley National Wildlife Refuge with a management priority to protect biodiversity by protecting habitat for hundreds of species of mammals, birds, butterflies, and plants including critical habitat for species protected under both the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, and the Migratory Bird Treaty Act, 16 U.S.C. § 703 *et seq.*[2] The Service completed an "Interim Comprehensive Management Plan" for the Refuge in 1997, with the stated vision to preserve "132,500 acres of mostly contiguous tracts of natural brush, reforested farmlands and wetlands." Ex. 3, at 5. In the words of the Service in 1997:

> Few wild places in the Western Hemisphere exhibit such a diversity of flora,
> fauna and geomorphic conditions as the lower Rio Grande Valley in south Texas.
> Its remnant natural habitats thrive along side social and economic activities. This
> can be a great advantage over the next twenty years if conservation and

---

[2] *Lower Rio Grande Valley National Wildlife Refuge*, U.S. FISH & WILDLIFE SERV., https://www.fws.gov/refuge/lower-rio-grande-valley (last visited Jun. 23, 2026) (citing 16 U.S.C. § 742f(a)(4)).

development activities are well coordinated. Still, few wild places have the opportunity for recovery from the brink of extinction. The Lower Rio Grande Valley and Santa Ana National Wildlife refuges include some of the last parcels of subtropical thorn forests in the U.S. and they represent the best chance for their protection and recovery. Ultimately, they will help form a functioning corridor to sustain the unique flora and fauna of the Texas/Mexico Border.

Ex. 3, at 5.

The Service projected in the 1997 Plan that the future of the Refuge "is one of land acquisition, habitat restoration, wetland recovery, and compatible wildlife dependent recreation where the American public can enjoy this rare treasure." *Id.* It also identified and clarified the Refuge's goals, including to "[p]rotect biological diversity" (in part through land acquisition), to "[p]rotect cultural resources" "for the benefit of present and future generations," and to "[a]ssist in the achievement of a contiguous river wildlife corridor." *Id.* at 6, 42. Specifically, the Service set a goal to acquire "approximately a minimum of 5,000 acres per year." *Id.* at 42.

The lands that the Service has now assigned for divestiture to SpaceX comprise a portion of an 8-mile long corridor running along the Rio Grande, Ex. 5, at 7, which were acquired by "condemnation proceedings in the 1990s." Ex. 4, at 2. This includes the Playa Del Rio and Coastal Corridor Additions in 1993. *See* Ex. 5. The Service acquired these lands to protect "up to 25,000 acres of clay lomas, wind tidal flats, and native dense brushland in Cameron County . . . to create a link between the Lower Rio Grande Valley and Laguna Atascosa National Wildlife Refuges for the purposes of protecting endangered species habitats and the natural biological diversity of the Lower Rio Grande Valley." *Id.* at 3. The Service's process of acquiring land for the Refuge continued until as recently as April 22, 2024, when the Service announced the

8

acquisition of 57 acres of "water features and native brush" for the Refuge and celebrated that the "properties are *protected in perpetuity* for the benefit of both wildlife and the public."[3]

According to the Service, the protection of these lands was intended to "preserve the last remnants of a unique native plant and animal community that has largely been lost in the Lower Rio Grande Valley." *Id.* at 8. Thus, "[t]he Boca Chica Tract has been one of the Service's primary conservation holdings along the Rio Grande," Ex. 21, at 1, "providing habitat for federally listed species such as ocelot, northern aplomado falcon, and piping plover," Dkt. 14-1, at 4. It was "identified for protection of the unique natural resources located thereon, including endangered species habitat, coastal wetlands, and barrier islands," as well as "scenic and cultural values." *Id.* at 5.

The 1997 Interim Comprehensive Management Plan was meant to guide the Service's management of the Refuge "over the next 5 to 10 years." Ex. 3, at 11. By law, the Service is required to develop an updated "comprehensive conservation plan" at least every fifteen years and whenever "conditions that affect the refuge or planning unit have changed significantly." 16 U.S.C. § 668dd(e)(1)(A)(iv); 16 U.S.C. § 668dd(e)(1)(E). The Service has never prepared a "comprehensive conservation plan" for this Refuge, nor has it revisited the interim management plan for the Refuge in almost thirty years. As a result, there is no conservation plan that addresses or even acknowledges the massive changes and environmental harm to the Refuge precipitated by the arrival of SpaceX.

While the Service has accomplished a significant consolidation of lands since the Refuge was established, several relatively minor inholdings remain in private ownership. As explained

---

[3] *National Wildlife Refuge System in Texas Grows by More Than 9,000 Acres*, U.S. FISH & WILDLIFE SERV., https://www.fws.gov/press-release/2024-04/national-wildlife-refuge-system-texas-grows-more-9000-acres (last visited Jun. 23, 2026) (emphasis added).

9

*infra*, some of these lands have been acquired by SpaceX in the past decade. Nonetheless, the current Boca Chica tract forms a mostly contiguous wildlife corridor, making it "one of the Service'[s] primary conservation holdings along the Rio Grande." Ex. 21, at 1.



By contrast, SpaceX's fragmented inholdings comprise fairly small parcels—most less than 20 acres—scattered across the roughly 25,000-acre Boca Chica tract. Ex. 5, at 3.

II.   Palmito Ranch Battlefield National Historic Landmark

On May 12 and 13, 1865, a full 34 days after Robert E. Lee surrendered at Appomattox, the historic battle took place for which Palmito Ranch became nationally famous. Ex. 6, at 9. This theatre of the war was opened when Union forces sought to blockade and disrupt Confederate access to foreign trade. Ex. 4, at 23. The port at the mouth of the Rio Grande was one of the few points at which Confederate states were able to export cotton and import weapons, unhampered by the Union naval blockades of their more northern ports. Ex. 6, at 9.

The battle began when a Confederate garrison under Colonel John Salmon Ford confronted Union troops over the course of two days in and around both Palmito Ranch and White's Ranch. Ex. 4, at 23; Ex. 6, at 28. Eventually the Union Army was driven back to its base

---

[4] Esri, *USA Federal Lands*, ARCGIS (Jun. 17, 2026), https://www.arcgis.com/apps/mapviewer/index.html?layers=85c76c5881c9482690e0ef990b49cd 30 (last visited July 17, 2026).

on Brazos Island and the Confederates drew back eight miles from Palmito Ranch. Ex. 6, at 28. That evening, "a shell from a ship stationed nearby . . . exploded between the two armies. . . . [M]ost accounts contend that this was the last shot of the Battle of Palmito Ranch, the last land battle of the Civil War." *Id.*; *see also* Ex. 8 at 5.

The National Park Service first granted national recognition for the battlefield site in 1993, when the site was placed on the National Register for its military significance and association "with events that have made a significant contribution to the broad patterns of our history." Ex. 8, at 6. The National Park Service noted that "the integrity of the entire battlefield" has been preserved and that the "landscape visible today is much the same as that the Union and Confederate soldiers experienced as they faced each other in battle." Ex. 8, at 30.

The Battlefield earned heightened recognition in 1997, when the National Park Service recognized it as a National Historic Landmark. Ex. 6, at 1. At the time, the National Park Service emphasized the national and international legacy of the Palmito Ranch battlefield as symbolizing "a part of the ongoing North-South struggle to secure a strategic economic and diplomatic position on the Lower Rio Grande—the gateway to Mexico." *Id.* at 33.

Again, upon the landmarking of the Battlefield, the National Park Service recognized its "exceptional integrity of setting, feeling, association and location, nearly 130 years after the battle" which allowed visitors to see the battlefield "very much as it [appeared] when Federal and Confederate troops fought the last land engagement of the Civil War on its windswept and marshy plain." *Id.* at 4. Of the "only five Civil War battlefields . . . documented in Texas," this is the last one recognized by the Civil War Sites Advisory Commission as "exhibit[ing] a 'good' level of integrity." *Id.* at 6.

11

III.    SpaceX's Decision to Move into the Heart of the Refuge.

In 2014—more than 40 years after the Refuge's creation—SpaceX received permits to use the area near Boca Chica as a space shuttle launch site. Ex. 16, at 2. That same year, it began acquiring land in the area and rapidly constructing infrastructure for its space shuttle program, including a new city called "Starbase," a launch test site at the former Massey ranch, a manufacturing facility, and a launch site near Boca Chica beach. *See* Ex. 7, at 18; Dkt. 15-3, at 4. These parcels are almost entirely surrounded by Refuge lands, meaning they were purchased as Refuge inholdings and have been operated as such ever since. Ex. 7, at 18. According to SpaceX's CEO Elon Musk, these lands were ideal for this type of operation because "[w]e've got a load of land with nobody around, so if it blows up, it's cool."[5]

Mr. Musk's sentiments aside, SpaceX has caused significant damage to Refuge lands since constructing its operations there, *see generally Ctr. for Biological Diversity v. Fed. Aviation Admin.*, 804 F. Supp. 3d 86 (D.D.C. 2025) (evaluating range of impacts from SpaceX operations in context of SpaceX expansion approved by Federal Aviation Administration)—with little to no response from the Service. Shuttle tests at the Massey test site have resulted in massive explosions, damaging the nests of protected bird species and scorching acres of Refuge land. *See, e.g.*, Declaration of Curt Bradley ("Bradley Decl.", Ex. A.[6] These explosions—euphemistically referred to as "anomalies," Ex. 4, at D-2; Ex. 16, at 98—have propelled debris

---

[5] Nancy Keates & Mark Maremont, *Elon Musk's SpaceX Is Buying Up a Texas Village. Homeowners Cry Foul*, WALL STREET JOURNAL, May 7, 2021, https://www.wsj.com/us-news/elon-musk-spacex-rocket-boca-chica-texas-starbase-11620353687 (last visited June 28, 2026).

[6] *See also* Brandon Lingle, *Boca Chica booms: A chronology of SpaceX explosions in—and over—South Texas*, SAN ANTONIO EXPRESS-NEWS (Sept. 12, 2024) https://www.expressnews.com/business/article/boca-chica-spacex-explosions-timeline-starship-19615935.php (last visited July 1, 2026).

12

and fiery shrapnel for miles, including concrete, metal, and dust. SpaceX has also been cited for using a hovercraft to transport staff across Refuge lands, including through nesting sites and critical habitat for protected birds and other species. *See* Ex. 11.

Overall, the "significant industrialization and development" adjacent to Refuge lands, "particularly associated with the expansion of SpaceX facilities and related infrastructure," "has led to increased disturbance in the Refuge from noise and lights, and elevated levels of habitat fragmentation, which have diminished the conservation value of these lands." Dkt. 14-1, at ¶ 13. As a result, the Service has recognized since at least January 2021 "that SpaceX's activities were already substantially impairing both its own ability to manage federal lands and the public's enjoyment of the Boca Chica Beach area." *Ctr. for Biological Diversity*, 804 F. Supp. at 95 (internal quotations omitted). The exchange will only exacerbate these problems, as the divested lands (which notably will still be inholdings surrounded by Refuge lands) are expected to be "developed and used by SpaceX for residential, commercial, institutional, infrastructure, and/or manufacturing activities." Ex. 4, at 8.

IV.    The Service's approval of the Land Exchange.

"Discussions" of a land exchange with SpaceX first began in 2023 but the Service did not formally announce and describe its plans until March 2026. *Id.* at 2; *see generally* Ex. 19. According to the Service, the purpose of the exchange is to "consolidate" National Wildlife Refuge System lands in Cameron County, Texas. Ex. 4, at 3. The Service claims that the exchange is needed to reduce land use conflicts that impede the Service's mission to conserve species' habitats, improve habitat protection, consolidate ownership, and simplify management of refuge lands. *Id.* at 3. The divested properties have, according to the Service, an "impacted . . . ability . . . to function as effective components of the regional conservation network." *Id.* at 2.

13

The Service cites noise and light disturbances, and SpaceX's increased industrial activity, as causes of this degradation. *Id.* at 18. The Service also acknowledges that the "proximity of Starbase" and SpaceX's launch activities cause some of the 50 to 75 fires which burn on the Refuge each year. *Id.* at 7.

Under the terms of the exchange, the Service intends to divest 727 acres of the Lower Rio Grande Valley National Wildlife Refuge, including 703 acres of the Palmito Ranch Battlefield National Historic Landmark. Ex. 1, at 1; Ex. 7 at 3. This divestment would sever a large parcel of contiguous wildlife corridor running along the Rio Grande River, meaning that wildlife seeking to migrate along the Refuge corridor may have to make the dangerous crossing over a highway to avoid future SpaceX development on that land. Declaration of Jim Chapman ("Chapman Decl."), ¶¶ 8, 13, 15. Collectively, the Service refers to these lands as the "Rio Parcels." Ex. 12 at 2. An additional 1.3 acres adjacent to Starbase, referred to as the "Starbase Parcel," would also be divested. *Id.* at 11. The Starbase Parcel—and the City of Starbase more broadly—are separated from the Rio Parcels by remaining Refuge lands.

In exchange for these divested parcels the Service would acquire a collection of parcels with an overall smaller acreage. *Id.* at 2. Roughly one third of these acres, the so-called "Las Palomas Parcels," are surrounded by other lands which are already a part of this Refuge and—according to the Service—are thereby already protected from development due to their inaccessibility to anyone other than Service staff or special permit holders. *Id.* The remaining two thirds of the acquisition acres are around nine miles north of the Refuge, geographically part of the separate Laguna Atascosa National Wildlife Refuge. *Id.* The acquired lands under the exchange do not include any historic property that is at all "comparable" to the hundreds of acres

14

of the Palmito Ranch Battlefield National Historic Landmark property that would be divested. 54

U.S.C. § 306121. The following map depicts the lands to be acquired and divested:



Ex. 4, at 4.

On June 1, 2026, the Service issued a Final Environmental Assessment and a "Finding of

No Significant Impact and Decision for Lower Rio Grande Valley and Laguna Atascosa National

Wildlife Refuges Boca Chica Land Exchange." Ex. 1. These documents announced a final

agency action approving the implementation of a formal exchange with SpaceX of 727 acres of

Refuge land, nearly all of which is also part of the National Historic Landmark, for 683 acres of

15

SpaceX's privately-held land. *Id.* at 2. The documents stated unequivocally that "[t]he Service *has decided to implement the Proposed Action as described*." *Id.* at 5 (emphasis added). In the Programmatic Agreement accompanying the approval, the Service "determined the Project is a federal undertaking … subject to review under Sections 106, []110, and 111 of the National Historic Preservation Act[.]" Ex. 7, at 1; *see also id.* at 2 (citing NHPA Section 111 and quoting its requirement to "ensure the protection of the historic property").

Because the Exchange is larger than 40 acres, it required a second approval by the Director of the Service, which was issued with a Decision Memorandum on July 13, 2026. Ex. 21. The Service asserted that the Exchange would benefit the Refuge by "reducing fragmentation of Refuge lands, improving habitat connectivity, and lessening the effects of industrial activities near existing Refuge tracts in the Boca Chica area by consolidating that activity on parcels already affected by industrial use." *Id.* at 4. Though the Service acknowledged that "SpaceX's planned development of the divested parcels will result in foreseeable and unavoidable consequences," *id.*, it claimed the Exchange would nonetheless "result in a net conservation benefit, as it will contain and consolidate development so it does not occur in a scattered, disruptive manner throughout the Refuge," *id.* at 5. With respect to the NHPA, the Service took the position for the first time that compliance with Section 111 is "optional." *See id.* at 6 n.1, 8.

V.   <u>SpaceX's Imminent Plans to Build Industrial and/or Residential Infrastructure on Refuge Lands.</u>

SpaceX stands poised to begin rapid construction on the historic battlefield and other national refuge parcels it would receive in the exchange. Construction equipment, including machinery and fill material, is already staged all along Highway 4, the road which runs along the northern border of most of the parcels slated for divestment. Declaration of Mary Angela Branch ("Branch Decl.") ¶ 22. Indeed, SpaceX has a history of rapid development in this region. Sets of

16

before-and-after satellite imagery show that Space X has frequently cleared, bulldozed and begun construction on other properties in the vicinity of the Refuge, sometimes in a matter of a few months. Bradley Decl. ¶¶ 7-9, Ex. 2-4. Images from June 2, 2023 and June 20, 2025 show a development owned by SpaceX before and after construction. Bradley Decl. ¶ 9, Ex. D. These images underscore how completely SpaceX is likely to destroy all habitat features on the land proposed for divestment. For example, the second image of Quicksilver drive shows that SpaceX did not leave even a narrow strip of land along the river that could have provided vital connectivity habitat for species travelling along the river. *Id*.

In light of such past episodes of quick and total habitat destruction, it is likely that SpaceX would move rapidly to begin construction on the parcels involved in this Land Exchange immediately upon the execution of the Exchange. Declaration of Rebekah Lynn Hinojosa ("Hinojosa Decl.") ¶¶ 10, 14;Chapman Decl. ¶¶ 9, 12-13, 15-18; Branch Decl. ¶¶ 22, 30.

STANDARDS OF REVIEW

I.    Preliminary Injunction Standard

"A plaintiff seeking a preliminary injunction must establish [1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest." *Glob. Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). When, as here, the government is the defendant, "[t]he balance-of-equities and public-interest factors merge." *Glob. Health Council*, 153 F.4th at 12. A preliminary injunction serves to maintain the status quo until a determination of the matter on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

17

II.    Standard for Review of the Merits

The Service's approval of this land exchange with SpaceX under the Refuge Act, the

NHPA, and NEPA is reviewed under the Administrative Procedure Act (APA). 5 U.S.C. § 706.

An agency action shall be set aside when it is "arbitrary, capricious [or] an abuse of discretion or

otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (D); *see also Ctr. for Biological*

*Diversity v. Zeldin*, 171 F.4th 356, 376 (D.C. Cir. 2026). An agency action is arbitrary and

capricious "if the agency has relied on factors which Congress has not intended it to consider,

entirely failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before [it], or is so implausible that it could not be

ascribed to a difference in view or the product of agency expertise." *Baystate Franklin Med. Ctr.*

*v. Azar*, 950 F.3d 84, 89 (D.C. Cir. 2020) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.*

*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

In addition, "an agency action that 'violates [a statute] is 'not in accordance with law'

within the meaning of [the APA].'" *Ctr. for Biological Diversity*, 171 F. 4th at 376 (quoting

*Chrysler Corp. v. Brown*, 441 U.S. 281, 318 (1979)). In assessing whether the agency is violating

a statute, the Court owes no deference to the agency but, rather, must apply the Court's own

"best" reading of the law. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

ARGUMENT

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS.[7]

"In ruling on a preliminary injunction a key issue—often the dispositive one—is whether

the movant has shown a substantial likelihood of success on the merits." *Greater New Orleans*

---

[7] For purposes of this motion, Plaintiffs highlight a subset of the claims for relief that they intend to include in a later summary judgment motion.

*Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1083 (D.C. Cir. 2011). Here, the Service violated the clear mandatory requirements of the NHPA, the Refuge Act, and NEPA in preparing and approving this land exchange.

    A.    <u>Plaintiffs Have Standing to Challenge the Exchange.</u>

To establish Article III standing, a plaintiff "must demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007). "It is common ground that . . . organizations can assert the standing of their members." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). "An association has standing if at least one member can establish injury, causation, and redressability." *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 111 (D.C. Cir. 2021).

"[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 183 (2000) (citations omitted). Similarly, a plaintiff has standing to challenge a federal land exchange where its members use and enjoy the federal lands, and the land exchange would prevent them from continuing to use and enjoy these lands. *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 1176-80 (9th Cir. 2000).

The Plaintiffs' declarations demonstrate that their members frequently use and enjoy the National Wildlife Refuge lands that will be privatized and developed as result of the Exchange. Chapman Dec., ¶ 7, 9, 10-13; Branch Dec., ¶ 7; Mancias Dec., ¶¶ 12-14; Hinojosa Dec., ¶¶ 5-9. These declarations explain how their use and enjoyment of the affected lands will be adversely impacted by the Exchange, first by privatization of the lands, and then by development.

19

Chapman Dec., ¶¶ 9, 12, 15-18; Branch Dec., ¶¶ 14-18; Mancias Dec., ¶¶ 15-16, 20; Hinojosa Dec., ¶¶ 7-9, 11-12. The Plaintiffs' members' injuries would be redressed if the Court holds unlawful and sets aside the Exchange. Chapman Dec., ¶¶ 18-19; Branch Dec., ¶ 31; Mancias Dec., ¶ 22; Hinojosa Dec., ¶ 15, 17. If the Service is required to further consider the Exchange upon remand, this could result in the agency modifying the Exchange in a manner that lessens the Plaintiffs' injuries, or canceling the Exchange altogether. Plaintiffs have thus established standing.

> B. <u>The Service violated the National Historic Preservation Act because it is not receiving comparable historic property through the exchange, and it is not ensuring preservation of the Historic Landmark that it is giving to SpaceX.</u>

Section 111 of the NHPA provides:

(a) Authority to Lease or Exchange – **Notwithstanding any other provision of law, each Federal agency**, after consultation with the Council –
  (1) Shall, to the extent practicable, establish and implement alternatives (including adaptive use) for historic property that is not needed for current or projected agency purposes; and
  (2) may lease historic property owned by the agency to any person or organization, or **exchange any property owned by the agency with comparable historic property, if the agency head determines that the lease or exchange will adequately ensure the preservation of the historic property.**

54 U.S.C. § 306121(a) (emphasis added).

Thus, where the Service seeks to exchange lands it owns that include a recognized historic property (such as the Palmito Ranch Battlefield National Historic Landmark), the Service may only proceed if (a) the action would exchange historic property for "comparable historic property," and (b) if the agency determines that the exchange would "adequately ensure the preservation of the historic property" 54 U.S.C. § 306121(a)(2). The Boca Chica Land Exchange would do neither, and is therefore in violation of the plain terms of the NHPA.

1.    The Service failed to ensure that it would receive comparable historic property in exchange for over 700 acres of the Palmito Ranch Battlefield National Historic Landmark

Under the NHPA, the Service must "assume responsibility for the preservation of historic property" that it owns or controls. 54 U.S.C. § 306101(a)(1). The Palmito Ranch Battlefield National Historic Landmark unquestionably meets the statutory definition of a historic property, *id.* § 300308; it is listed on the National Register, Ex. 7, at 25, and it has been designated a national historic landmark, *id.* Thus, under the statute's plain language, the Service must manage the Battlefield Landmark as a historic property in accordance with the NHPA.

This includes NHPA Section 111, which only authorizes the Service to "lease historic property owned by the agency to any person or organization, or *exchange any property owned by the agency* **with comparable historic property**, if the agency head determines that the lease or exchange will adequately ensure the preservation of the historic property." 54 U.S.C. § 306121(a)(2) (emphasis added). Here, the parcels that the Service would acquire under the Exchange have not been identified as having any distinguished historic value, let alone a value that can plausibly be called "comparable" to that of the Battlefield Landmark. The Exchange therefore violates NHPA Section 111's mandatory duty to trade historic property for nothing less than "comparable" historic property. 54 U.S.C. § 306121(a)(2).

2.    The Service did not ensure the Exchange would adequately preserve historic property.

NHPA separately imposes mandatory requirements on the Service to protect historic property that it owns. As stated above, Section 111 permits exchanges of historic property only when the agency "determines that the . . . exchange *will adequately ensure the preservation of the historic property*." 54 U.S.C. § 306121(a)(2) (emphasis added). Because the Exchange involves a national landmark, the Service is also subject to NHPA Section 107's requirement to

21

"undertake such planning and actions as may be necessary to minimize harm to the landmark"
before approving any undertaking. *Id.* § 306107; *see also Nat'l Parks Conservation Ass'n v.
Semonite*, 916 F.3d 1075, 1079 (D.C. Cir. 2019) ("[T]he National Historic Preservation Act . . .
required the [agency] to 'take into account the effect of the undertaking on any historic property,'
54 U.S.C. § 306108, and, if the project might 'directly and adversely affect any National Historic
Landmark,' to take steps 'to minimize harm to the landmark, *id.* § 306107.")

For the Boca Chica Land Exchange, the Service relies on various mitigation measures
that fall far short of "minimiz[ing] harm to" and "adequately ensur[ing] the preservation of" the
Battlefield Landmark. First, the Programmatic Agreement requires SpaceX to "retain a qualified
archaeologist" during "disturbance or development" of the lomas. Ex. 7, at 6. This requirement
only addresses the adverse effects on unrecorded properties, such as human remains and human
artifacts. Both the National Park Service and the Service itself acknowledge that these lomas
played a key role in the course of the historic battle. Ex. 6, at 6; Ex. 4 at 23.[8] The mere presence
of an archaeologist while the battlefield is bulldozed in no way ensures preservation of the
historic qualities for which this land and the lomas on it were given landmark status. On the
contrary, the inclusion of this clause implies that the Service fully expects SpaceX to destroy the
delicate ecosystem and historical features the lomas contain.

Second, the Service failed to impose any enforceable restrictions or mitigation measures
on the vast majority of the historic acres that it plans to divest. While this Exchange would give
703 acres of the National Historic Landmark to SpaceX, the Exchange only provides substantive

---

[8] *See also* Ex. 6 at 6 ("Small hillocks, or lomas, currently dot the battlefield area, and were
present at the time of the conflict. These small increases in elevation, none of which rise more
than thirty feet above sea level, were important to both armies for gathering intelligence.
Likewise, the dense thickets that grew on the hillsides provided both surveillance and cover.").

protections in the form of deed restrictions on one 10 acre area of the Landmark, which the Service has dubbed the "White's Ranch Preservation Area." Ex. 7, at 6. On these 10 acres, SpaceX would be prohibited from "development inconsistent with the historic character of the site." *Id.*

The remaining 694 acres of the Battlefield Landmark being handed over to SpaceX *receive no enforceable protections*. The Service acknowledges that "[t]he visual introduction of residential, industrial, or other development within the Palmito Ranch Battlefield National Historic Landmark may alter the characteristics that qualify it for listing in the National Register and diminish its integrity (i.e., integrity of setting and feeling), or its ability to convey its significance." *Id.* at 22. But the Service concludes that it is "not possible to specify" these effects since it has not seen SpaceX's plans for the development of the site. *Id.* The Service cannot claim ignorance while elsewhere acknowledging that lands under SpaceX control "could be used for residential, commercial, industrial, and infrastructure purposes in the near term consistent with other parcels owned and managed by SpaceX." Ex. 4, at 19.

In sum, the Service failed to "adequately ensure[d] the preservation of the historic propert[ies]," 54 U.S.C. § 306121(a)(2), on these 693 acres—more than 98% of the total affected area—while ignoring the impacts of development activities that the agency itself described as "reasonably foreseeable." Ex. 4, at 19. Thus, Plaintiffs are likely to prevail on their NHPA claim. *See also City of Berkeley v. United States Postal Serv.*, No. C 14-04916, 2015 WL 1737523, at *4 (N.D. Cal. Apr. 14, 2015) (surveying NHPA and NEPA cases where preliminary injunctions were granted, and noting court's earlier temporary restraining order); *Comm. for the Pres. of the Seattle Fed. Reserve Bank Bldg. v. Fed. Reserve Bank of San Francisco*, No. 08-1700, 2010 WL 1138407, at *6 (W.D. Wash. Mar. 19, 2010) (setting aside proposed sale where there was "no

23

evidence in the record" that the agency considered alternatives that would have better protected the historic property).

          3.      <u>The Service's suggestion that Section 111 of the NHPA is "optional"<br>violates the unequivocal language of the statute.</u>

As explained, the plain language of Section 111 of the NHPA imposes mandatory duties on federal agencies who seek to exchange historic property. Section 111 initially provides the agency with discretion as to whether or not it chooses to exchange historic property. 54 U.S.C. § 306121(a)(2). However, that discretion is circumscribed by two mandatory requirements: (1) the statute requires that the historic property must be exchanged for "comparable historic property," and (2) the agency must determine that the exchange "will adequately ensure the preservation of the historic property." *Id*. The Service here has chosen to exchange a historic property, and acknowledged throughout the administrative process that the NHPA as a whole, and Section 111 specifically, therefore applies to the Exchange. Ex. 4 at 20-21 (Final EA); Ex. 7 at 1-2 (Final Programmatic Agreement).

However, in a footnote within its July 13, 2026, Decision Memorandum, the Service takes the position for the first time that Section 111 is "optional." Ex. 21 at 6 n. 1. In sole support, the Service references the "question" portion of an unrelated—and since superseded—2020 Advisory Council question-and-answer guidance concerning an executive order. *Id.* at 6 n.1. But an agency guidance document cannot rewrite the plain language of the NHPA, which unquestionably applies to the Service's decision to transfer 700 acres of a National Historic Landmark to a private company. *Supra* at pp. 21-23; *see Loper-Bright Enters. v. Raimondo*, 603 U.S. 369, 393-95 (2024) (courts must exercise their independent judgment, and may not defer to an agency interpretation of a statute even if it finds that the statute is ambiguous).

Moreover, the language quoted in the footnote appears in a section of the advisory guidelines discussing how agencies can "ensure the long-term preservation and use of federal historic properties," and the Advisory Council recommends agencies rely on "Section 111 or other authorities to *enable the continued use of historic properties in [the agency's] inventory*." Ex. 22, at 6 (emphasis added). Thus, the quoted language is clearly intended to augment agency authority to *retain* historic properties, not give them away.[9]

C.      The Service violated the National Wildlife Refuge System Improvement Act because the land exchange will not further the purposes of or benefit the Refuge and is inconsistent with the Service's management plan for the Refuge.

The Refuge Act requires the Service "to fulfill the mission of the [Refuge] System, as well as the specific purposes for which the refuge was established." 16 U.S.C. § 668dd(a)(3)(A). The Service must therefore ensure that the mission of the National Wildlife Refuge System as a whole and the purposes of each individual Refuge are carried out. *Id.* § 668dd(a)(4)(D). In the event "a conflict exists between the purposes of a refuge and the mission of the system, *the conflict shall be resolved in a manner that protects the purposes of the refuge*." *Id*. (emphasis added). The Service's own guidance adds further context to these statutory mandates, requiring that any "exchange must provide a net conservation benefit to the refuge," which includes a comparison of "the conservation value of the land to be acquired against the conservation value of the land to be divested." 342 FW 5, § 5.7(B)(2)(c). In addition, the Service must consider "any available information about planned uses of the land to be divested and the impacts of those uses on the refuge." *Id.*

As emphasized in a 2023 U.S. Department of Interior Solicitor's Memo interpreting the

---

[9] That the NHPA's exchange provision applies "[n]otwithstanding any other provision of law," 54 U.S.C. § 306121(a), also undermines the Service's "optional authority" interpretation.

25

Refuge Act, the Service should "apply heightened standards to land exchanges," U.S. Dept. of Interior Office of the Solicitor, M-37078, National Wildlife Refuge Land Exchanges, May 31, 2023, at 11 (hereinafter "Solicitor's Memo" and attached as Ex. 9), requiring that each exchange "provide a conservation benefit to the refuge," "further the individual refuge's purposes," *id.* at 6, and lead to conservation benefits that outweigh the identifiable harms, *id.* at 10. According to the Solicitor, the Service should "only consummate those exchanges that would further the Refuge System's mission *and the individual refuge purposes*." *Id.* (emphasis added).

Here, the Service has failed to demonstrate that the Boca Chica Land Exchange will benefit or further the purposes of either the Lower Rio Grande Valley National Wildlife Refuge or the overall system. Nor could the Service make such a demonstration, since the Exchange will give away over 700 acres of the Lower Rio Grande Valley Refuge to SpaceX without yielding any actual net benefits to the Refuge. The Exchange will result in a significant loss of acreage within the Lower Rio Grande Valley Refuge (again, including over 700 acres of a National Historic Landmark, as well as important wildlife habitat), and a net loss of acres to the refuge system more broadly. To the extent the basis of the Service's decision is to benefit another refuge—or the refuge system as a whole—that type of prioritization is explicitly forbidden under the Refuge Act. 16 U.S.C. § 668dd(a)(4)(D).

Further, the Service's conclusions regarding purported benefits from the Exchange are illogical at best and contradicted by the record. Even crediting the Service's flawed habitat assessments concluding that those acres are low- to medium-quality habitat, the Refuge is far better off with 700 acres of low- to medium-quality habitat under federal protection than it will be with 700 acres of SpaceX industrial development encroaching further into the Refuge.

The Service also suggests that divesting this land to SpaceX will "reduce[] edge effects,

26

light and noise encroachment, and land use conflicts that currently diminish the conservation function of several LRGVNWR parcels." Ex. 1, at 1; *see also* Ex. 4 at 20. In other words, the Service acknowledges that current Refuge lands are negatively impacted by SpaceX's industrial activities on adjacent private lands. But the solution it offers—to just give those lands away to SpaceX—will not actually address this core problem, since SpaceX can still build factories and explode rockets on the newly-acquired parcels (including where those acres abut Refuge lands) leading inevitably to more "edge effects" down the road. Thus, all "available information about planned uses of the lands to be divested and the impacts of those uses on the refuge," 342 FW 5, § 5.7(B)(2)(c), undermines the Service's action here.

Indeed, the Service seems elsewhere to acknowledge this fact, at least with respect to the lands to be acquired under the Exchange, reflecting that they are "at risk of development," and that "[s]uch development on private inholdings within [the Refuge] could increase land use conflicts through additional vehicular traffic, edge effects, and loss of habitat." Ex. 4, at 9. In other words, according to the Service, the benefit of taking inholding parcels out of SpaceX's hands is that it will prevent the company from developing them. But the Service fails to apply this same logic to the large SpaceX inholding within the Lower Rio Grande Valley Refuge created by the Exchange. If the purported problem here is that SpaceX's operations spill over onto Refuge lands, moving the property line further into the Refuge is hardly a viable solution. This is an "important aspect of the problem" that the Service either overlooked entirely or failed to adequately explain. *Baystate Franklin Med. Ctr.*, 950 F.3d at 89.

The Service's reliance on purported "fragmentation" benefits, Ex. 1, at 3; Ex. 21, at 4, is also contradicted by the record. As the Service acknowledges, 216 acres to be divested under the Exchange—referred to as the "Las Palomas Parcels"—are private inholdings that cannot

27

currently be accessed by SpaceX. Dkt. 14-1, ¶ 16. Thus, even if those areas of the Refuge appear "fragmented" when viewed on a map, they are protected from industrial and residential development as a practical matter by virtue of their location within the Refuge. Those parcels are just as protected before the Exchange as after, further undercutting the Service's stated rationale for transferring valuable Refuge lands to SpaceX.

This fragmentation-oriented rationale similarly fails to justify giving away the Rio Unit, depicted below:



Figure C-3. Service-managed lands in the Boca Chica area before (left) and after (right) the proposed land exchange – detailed view (2 of 3).

The left side shows SpaceX's current ownership within the Rio Unit, comprising a smattering of fragmented inholdings. Most of these parcels are less than 20 total acres, the most impactful being the 21-acre Massey test site where SpaceX occasionally explodes its rockets.

After the Exchange, depicted on the right, SpaceX will control a massive 700-acre

28

inholding in the heart of the Boca Chica tract's wildlife corridor along the Rio Grande. SpaceX will be able to industrialize the entire area, creating a more significant, permanent barrier to wildlife migration through this critically important habitat. And there is nothing stopping SpaceX from developing right up to the new property line, inevitably causing the kinds of "edge effects" the Exchange is supposed to avoid. Thus, while the Exchange would likely benefit SpaceX by reducing the fragmentation of its own inholdings, it will provide no positive impacts to the Refuge or the wildlife it was set aside to protect, fragmentation or otherwise. The Service's conclusion to the contrary is illogical at best. SpaceX has deliberately purchased fragmented inholdings in the heart of a national wildlife refuge over the past decade. The decision to reward that land acquisition strategy with a larger—and inevitably more destructive—inholding within the Refuge is arbitrary and capricious.

Finally, the Exchange undermines the purposes of the Lower Rio Grande Valley National Wildlife Refuge and violates the related requirement to "manage the refuge … in a manner consistent with the plan." 16 U.S.C. § 668dd(e)(1)(E). Again, this Refuge was established "with a management priority to protect biodiversity,"[10] and the Refuge Plan states an intention to continue acquiring 5,000 acres per year until the Refuge fills 132,500 acres of mostly contiguous tracts of wildlife habitat. Ex. 3, at 5, 42. Even before the Exchange, the Refuge was over 30,000 acres short of its goal.[11] Trading away these 727 acres to SpaceX would further degrade and fragment these lands and the habitat they provide—and it would create a permanent gap in otherwise-contiguous habitat along the Rio Grande River—in contravention of the Refuge Plan's

---

[10] *Lower Rio Grande Valley National Wildlife Refuge*, U.S. FISH & WILDLIFE SERV., https://www.fws.gov/refuge/lower-rio-grande-valley (last visited Jul. 17, 2026).
[11] U.S. Fish & Wildlife Service, Statistical Data Tables for Fish & Wildlife Service Lands (as of 9/30/2025) (June 9, 2026, 3:00 pm PT), https://www.fws.gov/sites/default/files/documents/2026-01/2025_annual_report_of_lands_data_tables-v2.pdf.

29

most basic purposes and goals, and in violation of the Refuge Act. 16 U.S.C. § 668dd(e)(1)(E).

In sum, none of the Service's justifications comply with the text or purpose of the Refuge

Act, let alone the "heightened standard" the Department of Interior has applied to exchanges of

refuge lands. For all of these reasons, the Court should enjoin this arbitrary and capricious

Exchange decision while the parties litigate the merits of Plaintiffs' claims.

    D.    <u>The Service is in ongoing violation of the National Wildlife Refuge System
Improvement Act by failing to prepare an up-to-date Comprehensive
Conservation Plan for the Refuge.</u>

The Refuge Act sets forth a clear requirement for each National Wildlife Refuge to have

in place an update-to-date comprehensive conservation plan. First, the Refuge Act required the

Service to prepare a plan for each Refuge within 15 years of October 9, 1997. *Id.* §

668dd(e)(1)(B). Once the initial conservation plan is in place, the Refuge Act requires that "not

less frequently than 15 years after the date of issuance," the Service must "revise the

conservation plan as may be necessary." *Id.* § 668dd(e)(1)(A)(iv). Furthermore, the Refuge Act

requires the Service to update the conservation plan if it determines "that conditions that affect

the refuge or planning unit have changed significantly. *Id*. § 668dd(e)(1)(E). As the Service

explains in its internal manual:

> We review a CCP, along with the rest of a refuge's planning portfolio, comprehensively
> every 15 years, or more frequently if necessary, to determine if a revision or other change
> is needed. This comprehensive review guides a refuge in determining what changes need
> to be made to existing plans and what new plans need to be developed to address a
> refuge's management and planning needs. The review includes assessing the status of
> existing refuge plans, new information learned through changing conditions, best
> available science, and the results of inventory and monitoring (see 701 FW 2). Each CCP
> review outcome is documented in the planning portfolio.

Ex. 20, § 3.15.

The Service has wholly failed to comply with these planning requirements for the Lower

Rio Grande Valley National Wildlife Refuge. First, the Service has never prepared a

comprehensive conservation plan for the Refuge, and is instead still relying on its 1997 "Interim Comprehensive Management Plan." *See* Ex. 3 at 3 and *passim*. The Service made clear in this "interim" management plan, however, that it was only intended to guide management decisions on the Refuge for "five to ten years." Ex. 3, at 8.

Second, nearly 30 years have now passed since the Service's completion of the 1997 Interim Plan. This is nearly double the number of years that Congress intended the Service to revise and update comprehensive conservation plans. 16 U.S.C. § 668dd(e)(1)(B).

Third, there is no question that the conditions that affect the Lower Rio Grande Valley Refuge have changed significantly since the completion of the 1997 Interim Plan, which again required the Service to revise and update the Plan. *Id.* § 668dd(e)(1)(E). SpaceX would not even be founded for another five years after the Interim Plan, and the company did not move into the area until 2014. At this point, the immediate area around the Refuge is home to a major rocket manufacturing and launch facility, as well as the growing town of Starbase.

The fact that SpaceX's nearby operations and activities have become a major threat to the Lower Rio Grande Valley National Wildlife Refuge is evidenced by the Exchange itself. However, the 1997 Interim Plan, which the Service continues to rely upon for management of this Refuge and throughout the Final EA, *see* Ex. 3 *passim*, is entirely silent on SpaceX because the company did not yet exist. Since the conditions affecting this Refuge have indisputably changed significantly since 1997, the Service is in ongoing violation of the Refuge Act for its failure to revise and update the Interim Plan. 16 U.S.C. § 668dd(e)(1)(E).  Enjoining the Land Exchange while the merits of Plaintiffs case is heard will provide the Court with the opportunity to determine whether the long outdated 1997 Plan needs to be updated and revised, as required by the Refuge Act, prior to any further consideration or implementation of the Exchange.

31

For the foregoing reasons, Plaintiffs are likely to prevail on their claims under the Refuge Act. Plaintiffs thus respectfully request that this Court grant their motion for preliminary injunction and temporarily pause the Exchange until the Court has an opportunity to rule on the merits of Plaintiffs claims.

E.    The Service violated NEPA by ignoring reasonable alternatives to the exchange.

NEPA requires the Service to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(H). The Department of Interior's NEPA handbook—which applies to the Service—similarly requires each environmental assessment to include "reasonable alternatives." Ex. 13, at 4. Given that the exchange involves unresolved conflicts concerning the use of current Refuge land as either wildlife habitat or commercial infrastructure, this statutory "alternative" requirement is triggered here.

In the Final EA, the Service defines the "purpose" of the proposal as "to consolidate lands of the NWRS in Cameron County, Texas, across a highly fragmented landscape of parcel ownership." Ex. 4, at 3. The "need" was defined as:

> [T]o reduce land use conflicts that impede the Services' mission to conserve species' habitats, improve habitat protection, consolidate ownership, and simplify management of refuge lands as established through the Administration Act (as amended), consistent with the *Final Lower Rio Grande Valley and Santa Ana National Wildlife Refuges Comprehensive Conservation Plan*."

*Id.* From this purpose and need, the Service developed one alternative: the Exchange. *Id.* at 7-8.

Plaintiff Center for Biological Diversity's comments on the Draft EA raised an additional reasonable, if not obvious, alternative: that the Service "exercise[] its existing authorities to restore and protect these lands rather than exchanging them." Ex. 2, at 17. As the Plaintiff explained, the Service has authority under existing statutes and regulations to protect the Refuge,

32

including wildlife and habitat, from degradation. *Id.* These authorities could more-effectively manage the purported "land use conflicts" caused by SpaceX's activities on adjacent lands without giving SpaceX an even larger footprint within which to further expand its operations.

For example, Service regulations prohibit, among other things: "[d]isturbing, injuring, spearing, poisoning, destroying, [or] collecting" any plant or animal, or attempting to do any of those things, 50 C.F.R. § 27.51(a); and, the "destruction, injury, defacement, [or] disturbance" of "natural objects" at the Refuge, *id.* at § 27.61. The regulations also broadly authorize the Service to "protect fish and wildlife and their habitat and prevent their disturbance, to protect Service lands, property, facilities, or interests therein and to insure the safety of the public to the fullest degree possible." *Id.* § 28.21. Industrial explosions that project fiery debris into adjacent Refuge lands certainly fall within these broad prohibitions, as do lesser impacts like hovercraft travel and light and noise pollution.

The Service also has another legal tool at its disposal to manage Refuge conflicts: deny rights-of-way across Refuge lands. *See* Ex. 4, at 26 ("Development of these lands is currently limited to rights of way."). In fact, the Service's own regulations prohibit right-of-way permits if "the use would conflict with the goals or objectives in an approved refuge management plan." 50 C.F.R. § 29.13. Here, SpaceX's industrial expansion is clearly inconsistent with the Refuge's goals and its Interim Plan.

Moreover, simply enforcing applicable laws and regulations would better serve the project need than the chosen alternative, which will inevitably only lead to more land use conflicts in the future as SpaceX expands its operations. Thus, the Service should have considered an alternative involving the better protection of existing Refuge lands affected by

33

SpaceX's activities, rather than simply deeming them "medium quality" based on years of SpaceX encroachment and then using that as justification to trade them away.

This court's decision in *Center for Biological Diversity v. Federal Aviation Administration* is not to the contrary. There, the plaintiffs challenged the NEPA analysis underlying the Federal Aviation Administration's (FAA) approval of an expansion of SpaceX operations in the Boca Chica area. *See* 804 F. Supp. 3d 86, 96-106 (D.D.C. 2025). This court rejected those challenges, in part relying on *Seven County Infrastructure Coalition v. Eagle County*, in which the Supreme Court reiterated the "substantial deference" agencies receive as to the "depth and breadth" of their NEPA analysis. 605 U.S. 168, 183 (2025). *Seven County* instructed that the courts' role in reviewing agencies' NEPA compliance is to ensure that the agencies have acted within a "broad zone of reasonableness," with the focus being on the "usefulness of any new potential information to the decisionmaking process." *Id.* Applying that standard to the FAA's implementation of the Commercial Space Launch Act, a statute governing the licensing of commercial space travel, Judge Nichols held that, "while parts of the [FAA's NEPA] analysis left something to be desired," it was not arbitrary or capricious. *Ctr. for Biological Diversity*, 804 F. Supp. 3d at 86. However, key to the court's analysis and conclusion was that "FAA was not writing on a blank slate" because SpaceX was already conducting extensive activities at the project site and so the "narrow question" presented was whether an increase in the type and frequency of launches would itself "have a significant impact on the environment when compared with not granting SpaceX the license." *Id.* at 96-97.

This case is easily distinguishable. Here, the FWS—whose fundamental mission, as well as the declared purpose of the Refuge Act, are explicitly focused on resource and wildlife protection—is making the unprecedented decision to give away to SpaceX refuge lands that are

34

ecologically, historically, and culturally valuable. The Service's refusal to consider reasonable (or any) alternatives to that extraordinary action—such as better protecting its own refuge lands from SpaceX's activities rather than, in effect, rewarding SpaceX for its past degradation of the environment—does not fall within even a "broad zone of reasonableness" and is therefore arbitrary and capricious. *Seven Cnty.*, 605 U.S. at 183.

For all of these reasons, Plaintiffs are likely to prevail on their claim that the Service's consideration of alternatives in the Final EA was arbitrary and capricious, and this Court should enjoin the proposed exchange relying on that EA pending full resolution of the merits.

## II.    PLAINTIFFS' INTERESTS WILL BE IRREPARABLY HARMED ABSENT THE REQUESTED PRELIMINARY INJUNCTION.

Environmental injury is generally irreparable and favors the issuing of an injunction. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."). The threat must be "certain and great, actual and not theoretical, and so imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm." *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (internal quotation omitted). The guiding purpose of a preliminary injunction is to ensure the "preserv[ation of] the relative positions of the parties until a trial on the merits can be held." *Camenisch*, 451 U.S. at 395. Thus, the irreparable harm standard is generally met if "plaintiffs [will] suffer irreparable harm *before a decision on the merits can be reached.*" *Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 288-89 (D.D.C. 2017) (emphasis in original) (citing *Sierra Club v. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 38 (D.D.C. 2013)).

35

The irreversible impacts that the Exchange will have on the Refuge and the National Historic Landmark easily meet this standard. To begin with, Plaintiffs' members have extensive recreational, cultural, historical, and other concrete interests in the specific areas of the Refuge and Historic Landmark lands that will be transferred to SpaceX under the Exchange. *See, e.g.*, Chapman Decl. ¶¶ 6-18; Mancias Decl. ¶¶ 2-22; Hartl Decl. ¶¶ 7-15; Branch Decl. ¶¶ 6-31; Hinojosa Decl. 6-17.

These interests will be irreparably harmed in the absence of injunctive relief. As stated by the Service, "[a]fter the completion of the congressional 30-day examination period, the Service's Region 2 Office will sign the land exchange agreement, opening a period for escrow and title curative actions before title transfer and completion of the exchange." Ex. 21 at 3. We are weeks away from the signing of the land exchange agreement, followed soon thereafter by the completion of the Exchange and the transfer of the Refuge lands to SpaceX. Thus, there is no question that the Exchange will occur prior to the resolution of this case on the merits, unless the Court issues a preliminary injunction.

Plaintiffs will be irreparably harmed the moment the Exchange is completed and these Refuge lands are privatized, as their members will no longer have the right to access these lands. *See Great Basin Res. Watch v. Burgum*, No. 3:26-cv-00378-MMD-CLB, slip op. at 14 (D. Nev. July 16, 2026) ("[T]he privatization of public lands clearly poses irreparable harm to those who would access those lands."). Multiple Plaintiffs' members have made clear that they regularly visit the area of the refuge that would be withdrawn from public access. Chapman Decl. ¶¶ 7-8, 12 ("I enjoy visiting the Refuge—including the so-called 'Rio Unit' proposed for exchange—to observe both the wildlife and plants. . . . I also especially enjoy the lomas (thickly vegetated low clay hills), which are biological treasures and provide important habitat for wildlife both within

36

and just outside the Refuge."); Branch Decl. ¶¶ 19, 22, 25, 31 ("[O]nce that land is privatized, SpaceX may choose to limit or fully exclude public access. I enjoy visiting the lomas and viewing wildlife in those areas of the Refuge, so damage to, or closure of access to those areas following the exchange will cause harm to my recreational and aesthetic interests."); Hinojosa Decl. ¶ 6; *see also Id.* at ¶ 8 ("If these acres of the Refuge remain publicly accessible during my upcoming trip, I plan to hike and take footage of wildlife habitat and whichever species I find.").*see Desert Citizens*, 231 F.3d at 1187-88 (reversing the denial of a preliminary injunction where a land exchange would have precluded the plaintiffs' members use and enjoyment of the public lands); *San Carlos Apache Tribe v. United States Forest Serv.*, 803 F. Supp. 3d 879, 955 (D. Ariz. 2025) (finding that the plaintiffs "have the better of these arguments," that the loss of access to public lands resulting from a land exchange would be irreparable harm), *aff'd sub nom.*, *Ariz. Mining Reform Coal. v. U.S. Forest Serv.*, 172 F.4th 641 (9th Cir. 2026) (affirming District Court's denial of preliminary injunction without passing on irreparable harm analysis).

The immediate, permanent loss of public access to the Refuge lands being exchanged would be particularly devastating for the members of the Plaintiff Carrizo/Comecrudo Nation of Texas, Inc., for which the exchanged lands are sacred ancestral lands that will now be inaccessible for cultural and ceremonial purposes due to their transfer into private hands. Mancias Decl. ¶¶ 6-9, 11-17. Juan Benito Mancias, the Chairman, or hereditary leader, of the Tribe, states that formalization of the land exchange would constitute "just the latest move in a long history of erasing the identity of the original People of Texas by destroying the lands we hold sacred." Mancias Decl. ¶ 2. The ceremonial life ways that Mancias and other members of the tribe have held at Boca Chica Beach for generations have already been disrupted by closures initiated by SpaceX. Mancias Decl. ¶¶ 6-8. As a result of the frequent inaccessibility of Boca

Chica Beach, Mancias has begun to hold ceremonies on the very "lands that [the Service] is now giving to SpaceX for development and destruction." Mancias Decl. ¶ 12. Loss of access to these areas, and destruction of the habitat thereon, would inflict serious "impact[s on] [Mancias's] religious and spiritual interests." Mancias Decl. ¶ 15; *see e.g., Apache Stronghold v. United States*, No. 21-15295, 2021 WL 12295173, *2 (9th Cir. March 5, 2021) (Bumatay, J. dissenting) (noting that transferring national forest lands to a private company would result in restricting a Tribe's access to a religious site).

Second, although SpaceX has kept its specific plans for these parcels secret, the Service anticipates that SpaceX's "reasonably foreseeable" uses of these lands range from "residential, commercial, industrial, and infrastructure purposes *in the near term*." Ex. 4, at 42 (emphasis added). Thus, according to the Service, "SpaceX's planned development of the divested parcels will result in foreseeable and unavoidable consequences." Ex. 21 at 4. These harms are imminent irrespective of fact that SpaceX has so far failed to disclose the exact nature and precise timeline for its construction. *See Friends of the Earth US v. Exp.-Imp. Bank of United States*, No. 1:25-cv-02235, 2025 WL 3516161, at *14 (D.D.C. Oct. 10, 2025) ("Declin[ing] to allow [Defendant-Intervenor corporation] (and the government) to prevail on th[e irreparable harm factor of the inquiry] because it [was] unknown exactly when" the intervening private defendant would commence the harmful project, given that the timeline was "in [that Party's] hands.").

Furthermore, the Service has stated that SpaceX's "land development activities generally include *replacement of existing land cover with a built environment*; introduction of noise and light from the presence and activity of humans, structures, vehicles, and equipment; and alteration of stormwater runoff." Ex. 4, at 42 (emphasis added). Therefore, even without the agency having seen specific development plans, the Service clearly expected that SpaceX's

38

ownership of these Refuge and National Historic Landmark lands will shortly result in construction activities that could utterly transform the environment and completely replace the natural and historic surroundings with a residential and industrial "built environment." *Id.*

There are also significant construction projects in the vicinity of the divested lands already. Branch Decl. ¶ 24. These include both a public project to expand Highway 4 as well as private development on parcels that SpaceX already owns. *Id.* Recently published satellite imagery also shows significant housing development by SpaceX at Quicksilver Drive. Bradley Decl. ¶ 9, Ex. D. As a result, construction materials and construction equipment have recently been staged along the roadway adjacent to the divested parcels. Branch Decl. ¶ 24. Given the proximity of these lands to their other construction projects, SpaceX would be capable of rapidly deploying equipment and construction materials on the divested parcels.

Satellite imagery, as well as photographs taken by Plaintiffs' members illustrate how completely and rapidly SpaceX is capable of removing the existing natural land cover. For example, between June 2, 2023, and November 16, 2023, satellite images of a parcel owned by SpaceX show that in a matter of months, nearly all natural ground cover was removed from the land. Bradley Decl. ¶ 8, Ex. C. Satellite images of Starbase itself reveal a similar pattern of rapid and total transformation from natural land cover to high-density industrial development. For example, satellite imagery between April 7, 2020 and June 15, 2021, show a complete elimination of natural ground cover, coupled with rapid construction of high-density developments. Bradley Decl. ¶ 7, Ex. 2. In both of these instances, SpaceX has demonstrated that it is capable of quickly removing longstanding natural habitat features. The threat of irreparable harm is therefore both actual and imminent.

39

All of these impacts would do lasting and irreparable harm to the Refuge, the National Historic Landmark, and Plaintiffs' interests. The Refuge and the Landmark host unique geological features and dense biodiverse habitat that has developed over thousands of years. Chapman Decl. ¶ 7; Branch Decl. ¶ 25. The landscape features a "diverse array of tidal and upland habitats" including tidal marsh, saline prairie, mangrove-dominated edges, coastal thornscrub, tidal marsh, and wind-tidal flats. Ex. 4, at 33. These latter two habitat types in particular provide valuable habitat for migratory birds such as the Rufa Red Knot. Hartl Decl. ¶¶ 10, 13-14. The thornscrub and mangrove habitats present on the divested lands also provide viable dispersal habitat for the endangered ocelot. Ex. 4, at 36. The habitat types present on the divested lands are also particularly non-resilient. For example, there is no proven habitat restoration technique for damaged tidal/algal flats. Ex. 16, at 102-103. In addition to preventing impacts to these fragile habitats, a preliminary injunction is necessary in order to prevent the widespread loss of native vegetation.

Another natural feature imminently threatened by the exchange is the exceedingly rare "lomas" or clay ridges that appear in the northern portion of the divested lands. Lomas appear in only three other places on earth (Russia, Australia, and Africa), and there is "no other similar habitat" in Texas outside of this part of the Rio Grande Valley. Ex. 18, at 14. These lomas are essential for multiple bird and mammal species including the ocelot and the aplomado falcon. Ex. 10, at 2-12, 3-4.[12] The Programmatic Agreement does not include any protections designed to prevent the destruction of these lomas, instead only requiring SpaceX to ensure an

---

[12] *See also id.* at 2-12 (noting that wildlife "depend on quality upland habitats such as brush-covered lomas, riparian, resaca (ox-bow lake) vegetation, and coastal prairies found on the Refuge"); *id.* at 3-4 ("The brushlands on the lomas are essential to the survival of the endangered ocelot, as well as providing protective roosting habitat for aplomado falcons.").

40

archaeologist is present during "future disturbance or development." Ex. 7, at 6. While this may facilitate the identification of "deeply buried archaeological deposits," *id.*, it will do nothing to minimize harm to the lomas themselves. Given that these lomas are among the highest points above sea level in the immediate area, it is reasonable to expect them to be early targets for development. And given their complex soil composition, restoration of the lomas, once disturbed, would be impossible. Chapman Decl. ¶¶ 7, 18; Branch Decl. ¶ 25.

The historic integrity of the Palmito Ranch Battlefield is also intrinsically linked to the preservation of these same natural features. Not only were the geologically unique lomas pivotal to the conduct of that famous battle but, due to the fact that "[t]he landscape of the battlefield had remained largely unchanged since the mid-nineteenth century[, . . .] the *landscape contributed to the battlefield's historic integrity* because it conveys the visual sense of the area as it must have appeared to the soldiers in 1865." Ex. 4, at 23 (emphasis added). Both the historically significant lomas and the viewshed throughout the National Historic Landmark could be permanently and irreversibly damaged in the absence of a preliminary injunction—damage that cannot be mitigated by the mere presence of an archaeologist during excavation. *See* Branch Decl. ¶¶ 28-29, 31; Chapman Dec. ¶¶ 7, 16, 18.

III.   THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH IN FAVOR OF AN INJUNCTION

In cases where the government is the opposing party, the Court's inquiry into the "balance of harms and the public interest factors merge." *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021). Courts are thus more likely "to give and withhold relief in furtherance of the public interest" than they would be "when only private interests are involved." *Yakus v. United States*, 321 U.S. 414, 441 (1944). The Refuge and the Palmito Ranch battlefield were both given statutory protection in order to serve specific public interests. *See Nat. Assoc. for the*

41

*Advancement of Colored People v. Fed. Power Comm'n*, 425 U.S. 662, 669 (1976) (the "public interest" in the context of a particular statute "take[s] meaning from the purposes of the regulatory legislation."). Here, any alleged harm to the Fish and Wildlife Service or to SpaceX does not outweigh the irreparable harm to Plaintiffs' and the public's interests in these public conservation lands and the historic landmark.

First, the Service's interests would not be harmed by a temporary suspension of the land exchanged. The pause would result in little more than an administrative burden on the agency, which does not outweigh the threat of irreparable environmental harm. *Amoco Prod. Co.*, 480 U.S. at 545; *see also American Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 966 (9th Cir. 1983). Additionally, no harms are likely to befall the lands that the Service seeks to acquire during a temporary injunction. The Las Palomas Parcels are inaccessible and therefore not likely to be developed. Moreover, the development of all the lands to be acquired will be entirely under the control of SpaceX, and the company is not likely to pursue any development on these lands since doing so would jeopardize the terms of this Exchange.

As for SpaceX, since a preliminary injunction would merely maintain the longstanding status quo of the Refuge lands, SpaceX could not suffer any irreparable injury from being temporarily prevented from developing land it has had no right to develop in any case. It is also well established that in the balance of harms, permanent environmental degradation of rare and vital habitat outweighs temporary, short-term economic interests. *League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) ("The balance of equities tips toward the [nonprofit] plaintiffs, because the harms they face are permanent, while the intervenors face temporary delay." (citing *Amoco Prod. Co.*, 480 U.S. at 545)).

Meanwhile, the public interest strongly favors preservation of these lands. The National Wildlife Refuge System, in general, serves distinct and important public interests in protecting these "environmentally rich lands." *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 672 (5th Cir. 1992) ("Through the Refuge System, the Fish and Wildlife Service has acquired millions of acres of environmentally rich lands, lands which are to be preserved in their natural state: no development, no mining, just mother nature's original recipe without any artificial ingredients. These lands provide a winter home to the thousands of migratory birds utilizing the 'Central Flyway.'"). Substantial public resources have been allocated over the Refuge's nearly half-century of existence. The lands which the Service proposes to divest, in particular, were originally acquired "through condemnation proceedings in the 1990s." Ex. 4, at 2. Huge numbers of members of the public, including Plaintiffs' members, visit this refuge every year. For example, in 2017, the only year for which data is available, the Refuge saw 69,858 visitors and generated nearly $2 million dollars of economic output for the local economy. Ex. 14, at 29.

The public interest also weighs in favor of maintaining the status quo on this National Historic Landmark. Congress expressly determined in the NHPA that "the preservation of [our] irreplaceable heritage is in the public interest." NHPA § 1(b)(4), Pub. L. No. 96-515, 94 Stat. 2987 (1980). That judgment reflects a national commitment to maintaining historic resources "for the inspiration and benefit of present and future generations." 54 U.S.C. § 300101(3). In the case of the Palmito Ranch Battlefield, the public interest in inspiring and educating visitors is inextricably tied up with preservation of the "exceptional integrity of setting, feeling, association and location, nearly 130 years after the battle" that still allows visitors to see the Battlefield "very much as it [appeared] when Federal and Confederate troops fought the last land engagement of the Civil War on its windswept and marshy plain." Ex. 6, at 4.

43

An injunction that temporarily prevents the enclosure and development of these historically and environmentally important lands would serve the public interest by protecting the irreplaceable value of this rare unspoiled environment while the Court decides the merits of Plaintiffs' claims.

IV.    PLAINTIFFS REQUEST THE COURT WAIVE ANY BOND REQUIREMENT.

Under Fed. R. Civ. P. 65(c), a court may issue preliminary injunctive relief if "the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." But under Rule 65(c), this Court has "broad discretion … to determine the appropriate amount of an injunction bond," *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), "including the discretion to require no bond at all," *P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (quoting *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012)). "In cases where the government is the enjoined party and no concrete economic injury is established . . . , courts routinely waive the bond requirement." *N. America's Bldg. Trades Unions v. Dept. of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025) (citing *P.J.E.S.*, 502 F. Supp. 3d at 520). Thus, public-interest litigation is a recognized exception where courts typically have not required Rule 65 security. *N. America's Bldg. Trades Unions*, 783 F. Supp. 3d at 315 ("Imposing a bond could unduly burden Plaintiffs and potentially impair their ability to seek judicial relief, a concern that courts have repeatedly recognized in declining to require bonds in public interest litigation."); *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) ("[C]ourts have held that security is not necessary where requiring security would have the effect of denying the plaintiffs their right to judicial review of administrative action.").

Plaintiffs' suit meets these requirements. Plaintiffs have brought this case to protect the public interest in a unique environment and nationally significant historical landmark, the Lower Rio Grande Valley National Wildlife Refuge and the overlapping portion of the Palmito Ranch Battlefield National Historical Landmark. Accordingly, Plaintiffs request that the Cout waive the bond or require the posting of only a nominal bond.

V.    CONCLUSION

Courts should be especially attuned to the need for preliminary injunctive relief in cases challenging federal land exchanges, as once title has been transferred, and modifications are made to the lands, it may become "impracticable to attempt to unscramble the eggs." *Kettle Range Conservation Group v. United States BLM*, 150 F.3d 1083, 1087 (9th Cir. 1998). Thus, by enjoining the exchange, the Court can ensure that it "does not inadvertently lose its ability to enforce an important Congressional mandate." *Id*. at 1088 (Reinhardt, J., concurring); *see also City of Berkeley*, No. C 14-04916, 2015 WL 1737523, at *4 (noting that in two other NHPA cases involving the exchange of property by the federal government, "courts granted preliminary injunctions and were able to review the cases on the merits.").

For all of the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' motion for preliminary injunction and enjoin the Exchange pending resolution of the merits of Plaintiffs' claims.

Dated  _7/20/2026_____                Respectfully submitted,


Ivan Ditmars (DC Bar No. CA00243)
Center for Biological Diversity
2100 Franklin St., Suite 305
Oakland, CA 94612

45

Phone: 510-844-7158
Email: iditmars@biologicaldiversity.org


Brandon Jones-Cobb (WA Bar No. 64828)
*Pro Hac Vice*
Center for Biological Diversity
P.O. Box 30604
Seattle, WA 98113-0604
Phone: 564-397-0830, ext. 478
Email: bjonescobb@biologicaldiversity.org

*Attorneys for Plaintiffs*

46